### TRANSCONTINENTAL PETROLEUM CO. v. INTEROCEAN OIL CO.

(Circuit Court of Appeals, Eighth Circuit.   December 12, 1919.   Rehearing Denied February 21, 1920.)

#### No. 5339.

1. CONTRACTS ⬅10(4)—MUTUALITY OF CONTRACT FOR SALE TO EXTENT OF BUYER'S REQUIREMENTS.

   A contract for the sale and purchase of a commodity, where the quantity to be delivered or received is measured by the output or requirements of an established plant or business during a limited time, does not lack mutuality.

2. CONTRACTS ⬅10(4)—MUTUALITY OF CONTRACT FOR SALE OF OIL LIMITED TO SELLER'S PRODUCTION.

   A contract, by a corporation operating some 20 oil wells, to sell a stated quantity of crude oil, to be delivered during two years, held not invalid, for lack of mutuality, because of a provision limiting its obligation to deliver to the production of its wells then owned or afterwards acquired during the term.

3. SALES ⬅71(4)—MUTUALITY OF PROVISIONS OF CONTRACT FOR SALE OF OIL.

   A provision of a contract for sale and purchase of crude oil, to be delivered through a stated time, that seller should not be bound to deliver beyond the production of its own wells, also limits purchaser's obligation to receive to such production.

4. WITNESSES ⬅287(1)—MAY EXPLAIN TESTIMONY ON CROSS-EXAMINATION.

   Where the superintendent of the export department of a large Mexican oil company, having wells from which the oil was piped and transported to his headquarters at the coast, where it was stored in tanks for shipment, testified that during the term of a contract his company did not load, deal in, or buy any oil other than from its own wells, the striking out of his testimony as hearsay, because of his statement on cross-examination that he was not at the wells during the time, and the refusal to permit him to explain that, while not stationed at the wells, he visited them, that he had charge of all transportation lines, and the men operating them, and of the books and records, showing the source of the oil handled, held error.

5. EVIDENCE ⬅317(1)—WITNESSES ⬅268(2)—OFFICER OF CORPORATION MAY TESTIFY AS TO ITS BUSINESS; CROSS-EXAMINATION AS TO SOURCE OF KNOWLEDGE.

   That the knowledge of an officer of a large corporation as to facts connected with its business is gained largely from others, and from records in the course of the business, does not render his testimony as to such

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

facts incompetent as hearsay, and while cross-examination as to his source of knowledge is proper, and may affect the weight of his testimony, that question is for the jury.

6. EVIDENCE ⟨key⟩158(27)—DAMAGES FROM BREACH OF CONTRACT MAY BE SHOWN BY PAROL.

On the question of damages resulting from breach by defendant of a contract to purchase crude oil, oral testimony as to other sales at the place during the time of default *held* not incompetent, as secondary, because the sales and purchases, as between the parties thereto, may have been evidenced by written contracts.

7. PRINCIPAL AND SURETY ⟨key⟩6—LIABILITY OF PARTY FOR DEFAULT OF ASSIGNEE; "GUARANTY."

A defendant, which contracted to purchase from plaintiff a large quantity of crude oil, to be delivered in future, *held* directly and primarily liable for breach of the contract by its assignee, notwithstanding a provision of the contract that in case of assignment defendant should "remain as simple guarantor for its fulfillment," for the term "guaranty," while strictly importing secondary liability, is often used in a broader sense to signify suretyship in general.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Guaranty.]

In Error to the District Court of the United States for the District of South Dakota; James D. Elliott, Judge.

Action at law by the Transcontinental Petroleum Company against the Interocean Oil Company. Judgment for defendant, and plaintiff brings error. Reversed and remanded for new trial.

Philip W. Russell, of New York City (Horner, Martens & Goldsmith, of Pierre, S. D., and Wing & Russell, of New York City, on the brief), for plaintiff in error.

A. K. Gardner, of Huron, S. D. (Colby & Brown, of New York City, on the brief), for defendant in error.

Before HOOK and STONE, Circuit Judges, and AMIDON, District Judge.

HOOK, Circuit Judge. This was an action by the Transcontinental Petroleum Company of the Republic of Mexico against the Interocean Oil Company of South Dakota for breach of a written contract of sale and purchase of crude oil produced in the Panuco oil fields, near Tampico, Mexico. The plaintiff was the seller, and defendant the purchaser. The breach claimed was in the failure of the latter and its assignee to take a large part of the quantity of oil contracted for. At the conclusion of plaintiff's evidence the trial court directed a verdict for the defendant and judgment followed accordingly.

[1, 2] At the threshold of the case is defendant's contention that the contract is void for want of mutuality of obligation. This involves a construction of the first three paragraphs of the contract. By the first paragraph plaintiff agreed to sell and deliver to defendant 1,200,000 barrels of Mexican crude petroleum oil upon terms and conditions specified, "provided, however, that deliveries in said quantity or in any quantity are limited to the actual production of the oil wells owned by the vendor and the production of other wells which may be from time

to time controlled by the vendor." The second paragraph provides for deliveries by plaintiff at the rate of not less than 50,000 barrels per month from January 1, 1914, to December 31, 1915, in cargo lots into defendant's vessels of stated capacities, failure of the latter to take the specified quantity in any month to be made up the next. The defendant was given the right to require plaintiff, by notice, to commence the monthly deliveries before January 1, 1914. By the third paragraph defendant agreed "to take said oil as above provided, and pay for the same at the rate" specified.

The argument of defendant is that the proviso of the first paragraph limiting plaintiff's undertaking to the production of wells owned or controlled by it made it entirely optional with plaintiff to deliver any oil at all. There is no merit in the argument. In effect, the contract bound the plaintiff to deliver the entire output of its wells, up to the quantities specified. No such personal choice or option was given to withhold or refuse deliveries of oil produced by its wells as is sometimes held to destroy the requisite mutuality of contract obligations. The limitation is a physical one, of a kind common in business affairs. When the quantity of a commodity to be delivered or received under a contract of sale rests in the uncontrolled will or desire of one of the parties, mutuality is lacking. It is otherwise when the quantity is measured by the output or requirements of an established plant or business during a limited time. Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co., 52 C. C. A. 25, 114 Fed. 77, 57 L. R. A. 696. This latter rule is an adjustment of legal principles to necessary and reasonable business usages. It appears plaintiff owned and controlled about 20 oil wells in the Panuco field, with extensive structural equipment, and though the life of any particular well might not be forecast with certainty, it is idle to say plaintiff did not have an established plant, the actual product of which it could bind itself to sell and deliver in whole or in part during the time limited. The plaintiff could not, without violating its contract, have capped its wells or choked their production to escape deliveries. In that respect a correlative duty on its part would be implied.

[3] The plaintiff contended at the trial that the proviso above discussed was for its sole benefit, and therefore it was not required to prove as part of its case that it was able and willing to make the deliveries of oil produced by its wells. The court properly ruled otherwise. In effect the plaintiff's contention was that its right to make deliveries was not limited to the product of its wells, but that defendant's right to require deliveries was so limited. If that were the contract, it would be unilateral. In most of the cases cited for the contention, the provisions held to be for the benefit of one, but not both, of the parties, related to incidental matters, not, as here, going to the very root of the contract and vital to its mutuality.

Plaintiff introduced evidence tending to show the following: Defendant gave notice under the contract advancing the beginning of the two-year delivery period to November, 1913. For the first five months defendant sent vessels, and received and paid for an aggregate amount of oil less by 78,256.09 barrels than the minimum quantity it

was required to take in that time. It refused to receive or pay for any oil thereafter. In April, 1914, it assigned the contract to one Von Reitzenstein under a clause that it might do so "and remain as simple guarantor for its fulfillment by its assignees." The assignee failed to take or pay for any oil. James Dickson, a witness for plaintiff, with 23 years' experience in the oil business in Mexico, testified that he had been superintendent of plaintiff's export department ever since its plant was built in 1911, and had under him in 1913 and 1914 about 200 employés, including assistant superintendents and foremen. He described the extensive plant of the plaintiff in the Panuco oil field and at the station where vessels were loaded. He said that during the contract period, 1913–1915, and before and since that time, the plaintiff possessed and controlled about 20 flowing oil wells in the Panuco field. Panuco is about 64 miles up the river from Tampico. The office of the witness was at Las Matillas, about 3 miles from Tampico. The oil flowed from the wells through pipes into flow tanks, thence by pipe lines about 2 miles into loading tanks at the river. It was then run into barges and taken down the river to Las Matillas, where it was pumped into storage tanks of several hundred thousand barrels capacity. He gave the dimensions, number, and capacities of the different instrumentalities and the quantities of oil on hand available for delivery at different times under the contract. He testified that the plaintiff did not load, deal in, or buy any other oil than that from its wells above mentioned.

[4] Without going into further details, it may be said that, except for what will be mentioned presently, the testimony of this witness was that the output of plaintiff's wells, the transportation and storage capacity of its plant, and the quantities on hand available for deliveries to defendant were much in excess of the requirements of the contract. During the cross-examination this occurred:

"Q. Now, you had not been up to Panuco for a number of years prior to 1914, had you? A. No, sir.

"Q. You had not been in 1912, had you? A. 1911 and 1912.

"Q. Since that time you had been down at Las Matillas? A. Yes, sir."

At the close of the cross-examination, and before the redirect examination, the court ruled that, because the witness had not been at the oil field since 1912, his testimony as to the source of the oil stored at Las Matillas was hearsay, and on motion of defendant it was struck out. Plaintiff's request that it be allowed to examine the witness further on that subject was denied. Later a request that the witness be permitted to explain his statement that he had not been up at Panuco since 1912 was likewise denied, as was also a formal offer to show by him that he meant that he had not been employed there since that year, but had originally constructed the pipe lines from the wells to the loading tanks at the river, and had been at the oil field a number of times during the contract period down to November, 1915, that no new pipe lines had been built; that as superintendent of plaintiff's export department he also had official charge of the conveyance of the oil by barge from the loading tanks at Panuco to Las Matillas, of the men engaged in that work, and of the plaintiff's books and records

concerning it. These rulings of the court left the plaintiff without proof of a vital part of its case. It had no other available witness upon that subject.

[5] Much of what officials of large enterprises know of their operations is necessarily learned "in the course of business" and from associates and employés, through conferences, conversations, letters, reports, records, and the like. It is upon such information that the business is directed and carried on. Considered narrowly and technically it might be regarded as proceeding in considerable measure from hearsay; but absolute, first-hand, personal knowledge is not as a rule practicable and is not required as an invariable rule of evidence. As Lord Ellenborough said, "the rules of evidence must expand according to the exigencies of society." Pritt v. Fairclough, 3 Campbell, 306. Cross-examination into the scope of the jurisdiction and duties of the officials and the sources and extent of their information may affect the weight of their testimony, which is for the jury. If plaintiff's president had not died, but had testified, as Mr. Dickson did, that his company did not "load, deal in, or buy" oil not of its own production, there would have been little, if any, question as to the admissibility of his testimony, even though it appeared that he had not been at the wells, 60-odd miles away. And we do not think it should have been ruled as a matter of law that like testimony by the superintendent of the export department was inadmissible. He testified to the fact positively, and no legal inference or presumption arises from the title of his office that he did not possess the requisite information. For aught that appears, the oil coming under his jurisdiction may have been about all that was produced by his company; his duties may have required constant and full information as to its origin and quantity—what was on hand from month to month, and what could be reasonably counted on in the future from the known source or sources of supply. One in charge of the export department of a Mexican oil company may have been bound to know such things as fully and definitely as the highest official. We also think that the statement of the witness, on cross-examination, that he was not at the oil wells after 1912, might well have been intended as meaning that he was not officially stationed there. That is not an unusual form of expression in like circumstances. When attention was drawn to the distinction on redirect examination, the witness should have been allowed fully to explain. Redirect examinations are primarily for such purposes.

[6] As bearing upon its loss and damage, the plaintiff offered testimony of other sales and purchases of oil in that neighborhood during the period of defendant's default. The trial court excluded it as not the best evidence, because it appeared the transactions were conducted by written correspondence or according to written contracts. But the sales, purchases, and prices were not required to be in writing. That they were so was casual or fortuitous as to others than the parties to those particular transactions. Oral evidence of the prices received and paid was not proof of the contents of writings, within the rule on that subject. Even if the writings had been introduced, there would still have been testimony that the transactions indicated were

consummated. The money might have passed by check or draft, but it would hardly be contended that those instruments must be produced. The existence of written evidence of a fact does not always exclude parol proof of it. Keene v. Meade, 3 Pet. 1, 7, 7 L. Ed. 581. For example, the mere fact of title to personal property may be shown orally, although there is a writing evidencing the sale. Dixon-Pocahontas Fuel Co. v. Grain Co., 71 W. Va. 715, 77 S. E. 362, Ann. Cas. 1914C, 115.

[7] Finally, as to defendant's liability for the default of its assignee: The contract says that upon its assignment defendant should remain as a simple guarantor. Strictly speaking the liability of a guarantor is for the debt or obligation of a third person, is secondary and collateral, and its enforcement depends upon compliance with certain conditions. The liability of a surety is original, primary, and direct. Hall v. Weaver (C. C.) 34 Fed. 104, 106. But the term "guaranty" is often used in a broader and more comprehensive sense. It is employed, also, to signify suretyship in general. See Saint v. Wheeler & Wilson Mfg. Co., 95 Ala. 362, 10 South. 539, 36 Am. St. Rep. 210. The customary incidents of a strict guaranty are lacking here. The principal obligation was primarily defendant's, not that of a third person; and while defendant had an unrestricted right to assign, the very act of assignment carried with it its assurance to plaintiff of fulfillment by its assignee. Except for the assignment by the defendant, the obligation to take and pay for the oil was its own, and under the circumstances its guaranty should be liberally, not technically, construed. We think it remained directly and severally liable for the default of its assignee. Neither a prior action against him nor his presence here is essential.

The judgment is reversed, and the cause is remanded for a new trial.