**WM. A. HAUSMAN CO., Inc.**

v.

**UNITED STATES.**

C. D. 2828; Protest Nos. 60/13841–
22655, 61/4991–22909.

United States Customs Court,
First Division.

Nov. 23, 1966.

Bogle, Gates, Wobrin, Wakefield & Long, Seattle, Wash. (Edward G. Lowry, III, Seattle, Wash., of counsel), for plaintiff.

Barefoot Sanders, Asst. Atty. Gen. (Sheila N. Ziff, New York City, trial attorney), for defendant.

Before OLIVER, NICHOLS and WATSON, Judges.

NICHOLS, Judge:

The merchandise involved in these cases, consolidated for trial, consists of vinyl suitcases imported from Japan and entered at the port of Seattle on December 1, 1958, and April 14, 1959, respectively.[1] They were assessed with duty at 17 per centum ad valorem and 21 cents per pound under paragraph 1539(b) of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, as manufactures wholly or in chief value of any product of which any synthetic resin is the chief binding agent. It is claimed that the articles are properly dutiable at 20 per centum ad valorem under paragraph 1531 of said tariff act, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, as bags, satchels, or cases of leather, by virtue of the similitude clause in paragraph 1559(a), as

amended by the Customs Simplification Act of 1954.

The pertinent provisions of the tariff act, as modified, are as follows:

Paragraph 1539(b), as modified, supra:

Laminated products (whether or not provided for elsewhere in the Tariff Act of 1930 than in paragraph 1539 (b) thereof) of which any synthetic resin or resin-like substance is the chief binding agent:

\* \* \* \* \* \*

Manufactures wholly or in chief value of any product described in the preceding item 1539(b), or of any other product of which any synthetic resin or resin-like substance is the chief binding agent . . \* \* \* 21¢ per lb. and 17% ad val.

Paragraph 1531, as modified, supra:

Bags, baskets, belts, satchels, cardcases, pocketbooks, jewel boxes, portfolios, and other boxes and cases, not jewelry, wholly or in chief value of leather (except reptile leather), or parchment, and manufactures of leather (except reptile leather), rawhide, or parchment, or of which leather (except reptile leather), rawhide or parchment is the component material of chief value, not specially provided for:

\* \* \* \* \*· \*

Bags, baskets, belts, satchels, pocketbooks, jewel boxes, portfolios, and boxes and cases, not jewelry; any of the foregoing not provided for heretofore in this item . . 20% ad val.

Paragraph 1559, as amended, supra:

(a) Each and every imported article, not enumerated in this Act, which is similar in the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty as

[1]. This case was heard and submitted before me at Seattle, Wash., on September 24, 1965. Plaintiff's brief was filed on March 16, 1966, and defendant's brief on August 5, 1966. It was resubmitted before the first division, as now constituted, on May 12, 1966.

the enumerated article which it most resembles in the particular before mentioned; and if any nonenumerated article equally resembles in that particular two or more enumerated articles on which different rates of duty are chargeable, it shall be subject to the rate of duty applicable to that one of such two or more articles which it most resembles in respect of the materials of which it is composed.

At the opening of the trial, the official papers (except a laboratory report) were received in evidence. It appears from these papers that plaintiff imported the merchandise herein for the account of Skyway Luggage Co., Seattle, Wash., and that the seller was Matsuzaki & Co., Ltd., Tokyo, Japan.

A sample of the merchandise was received in evidence but was inadvertently lost. The parties subsequently stipulated that it consisted of a vinyl suitcase with a 3-way zipper; that the vinyl portion resembled leather in appearance; and that said vinyl portion resembled in appearance the sample of material attached to the stipulation. Said material consists of a black top layer resembling leather in appearance, a thicker middle layer of a grayish white substance, and a bottom layer of black fabric. (From the way the case has been presented, it appears that both parties are in agreement that the middle layer is the most valuable, but the only evidence on this point is in the deposition of Shutaro Sawada, discussed infra.)

The United States Customs Laboratory report referred to above was later received in evidence as plaintiff's exhibit 5. It contains the following:

The sample is composed approximately as follows:

| Component | Percent by weight | Percent ash in resin |
|---|---|---|
| Synthetic resin-surface layer | 14.5 | 5.3 |
| Synthetic resin-middle layer, foamed | 31.1 | 16.5 |
| Synthetic resin, piping | 1.9 | 1.0 |

\* \* \* \* \* \* \* \* \* \* \* \*

\* \* \* The "simulated leather" portion of the sample is made up of two layers of synthetic resin (polyvinyl chloride type) and a layer of rayon fabric. The outside layer of resin is thin and dense. The middle layer is thick, foamlike.

In our opinion, the resin in the middle foamed layer is acting as the chief binding agent in this layer.

————◆————

The court also received in evidence a photostatic copy of the chemist's worksheet, defendant's exhibit A. It states, among other things, "Ash essentially $CaCO_3$."

Plaintiff offered in evidence three depositions of Japanese witnesses, two taken pursuant to letters rogatory and one pursuant to a commission. The latter is in evidence as plaintiff's exhibit 2. It was taken after the other two pursuant to an understanding with Japan not previously in effect. The hearing judge reserved for the division the admissibility of the deposition of Yoshiki Ishizuka on letters rogatory and the questions were marked plaintiff's exhibit 1–A for identification and the answers 1–B for identification. Decision was also reserved as to the Government's objections to certain of the answers given to the interrogatories propounded on letters rogatory to Shutaro Sawada and his deposition was marked plaintiff's exhibit 3 for identification.

Translations of the Japanese originals of the depositions of Yoshiki Ishizuka and Shutaro Sawada were filed on December 31, 1964; the parties stipulated that the translations were correct and accurate except as to matters noted by the Department of State, Division of Language Services; and, for the convenience of the court, the parties filed copies of the translated depositions modified to reflect the changes. (See stipulation filed March 15, 1965.) These are the exhibits marked exhibit 1–B for identification and exhibit 3 for identification, respectively. The stipulation provided that the Government have 60 days in which to submit cross-interrogatories, but it stated later that it did not desire to file any.

The Government's objections to the deposition of Yoshiki Ishizuka fall into two categories: (1) A general objection on the ground that only 10 interrogatories were sent out but the Japanese judge before whom the deposition was taken expanded the examination into 43 questions, and (2) an objection to questions and answers 13 through 43 on the ground that the answers were based on hearsay.

(1) In its brief defendant stated that interrogatories 1 through 10 and the answers thereto are not objected to as they relate to the original interrogatories sent out, but interrogatories 11, and 13 through 43 are objected to on the ground that they are not the same as, nor even similar to, any of the interrogatories sent out. Plaintiff agreed that 13, 14, and 20 through 43 might be stricken so the court must rule only on 11, 15, 16, 17, 18, and 19.

 Rule 21 of this court provides for both the commission and the letters rogatory procedures and states in subdivision (g) that a commission or letters rogatory shall be sent to the proper authority "together with the interrogatories and cross-interrogatories attached." Letters rogatory are formal requests addressed by a court in which an action is pending to a foreign court asking that the witness be examined by the court. 28 U.S.C. §

1781; 22 CFR 92.49, 92.54; Rule 28(b), Rules of Civil Procedure; 2 Hackworth, Digest of International Law 97–101; 2 Bouv. Law Dict., Rawle's Third Revision, pp. 1935–1936. Ordinarily, if a commission or letters rogatory is accompanied by a list of interrogatories and cross-interrogatories, the commissioner or court will propound to the witness the questions contained therein, but if the commission or letters rogatory are not so accompanied, questions will be propounded orally by the parties or their attorneys. 2 Hackworth 98–99.

In the instant case, the clerk of the court wrote to the plaintiff's attorneys on November 27, 1962, advising them that the Government of Japan would not accept commissions; that letters rogatory must be submitted to the State Department for transmission to Japan; that they must be accompanied by a complete translation of the letters rogatory, interrogatories, and attached documents, and that, in accordance with the Japanese legal requirement that parties be notified of the date and place appointed by the court to take testimony in Japan, the principals or their attorneys should prepare statements waiving their right to be present or stating their intention to do so. Waivers by both the Government and the plaintiff were filed in this case.

It might well seem, as plaintiff urges, that in requesting as we did that the "appropriate judicial authority" assist us, and stating that "without the testimony of" the witness "justice cannot be completely done," we were asking for more than a mere notary's services. It looks as if the judge reframed the questions and expanded them in his best judgment, to be sure we got the information we wanted, if possible. He did not venture into any new or different subject matter. We need not say whether the answers were inadmissible solely because of the rephrasing and expansion the questions underwent, because ruling can be made on other grounds.

 (2) As stated, the Government does not object to the first 10 interrogatories. Questions 11 and 12 were to de-

termine whether the witness had personal knowledge of the subject matter and are unobjectionable, particularly since the answers bring out that the witness did not have such personal knowledge. The Government objects to the balance of the testimony on the ground that it is hearsay. The questions and answers plaintiff did not agree to have stricken show that the witness obtained his information from Kikuji Matsuzaki, then head of his department, and from Masahiro Kinoshita, chief of the export section. While this evidence is not hearsay, it is not relevant. We have Kinoshita's deposition. The said questions and answers are excluded as irrelevant.

The testimony of Shutaro Sawada was given in answer to the interrogatories submitted. The Government objects to the answer to interrogatory 9 on the ground that it was not responsive. The question and answer read:

9. Did your company sell sponge-like plastic sheet materials for brief-cases and cases to Matsuzaki & Company, Ltd. in Tokyo between 1957 and 1959?

I have heard of the name of Matsuzaki Sangyo K.K., but we have never had any direct transactions with it. However, our company because of our patents, was exclusively manufacturing and selling sponge-like plastic sheet materials in 1957 and 1958; sometime in 1959 other companies started to produce a similar product.

While the question calls for a "yes" or "no" or "I don't know" answer, the witness gave the information he had, which on oral examination might have been elicited by further questions, a procedure not possible here. In its implication, the answer is responsive.

The Government also objects to the answer to questions 10, 12, 13, 14, and 15 on the ground that the witness was not qualified, as indicated by his answers to questions 5 and 8. The witness stated in the latter answers that he had graduated from a commercial high school, had been in the Armed Forces, had been with a bank, had joined Sansuta (Sun-Star) Dental Cream K. K. holding company of his present company, had been transferred to two or three subsidiary companies, and has been chief of the second section of the business department of Sansuta (Sun-Star) Chemical Industrial K.K. since 1955. He said that the function of that position was to sell vinyl leather and adhesives made by the company to domestic trading companies which sold overseas. Questions 10, 12, 13, 14, and 15 relate to the composition of and manufacturing process used to produce the sponge-like plastic sheet material made by his company. Answering 13 and 14, he states that calcium carbonate is used as a "vesication-adjuster," not as a filler, and in 15, says that nothing was used as a filler. These last three particularly go to the vital issues in this case.

There is nothing to show Mr. Sawada was a chemist. Normally the testimony of a person not a chemist on the chemical composition of a product is inadmissible. United States v. C. J. Tower & Sons, 38 CCPA 131, C.A.D. 450. Plaintiff offers in its brief no authority to show that this case does not govern, but possibly it intends to invoke and broaden the rule this division recently stated in Royal Cathay Trading Co. et al. v. United States, 56 Cust.Ct. 371, C.D. 2662, that a responsible executive concerned with designing, specifying, importing, promoting and selling certain merchandise can testify what its uses are. We referred in that opinion to the classic statement in Transcontinental Petroleum Co. v. Interocean Oil Co., 262 F. 278, 282 (8th Cir. 1919), upholding the competency of testimony by officials of large corporations with respect to matter concerning the operations of their companies they have learned through conferences, letters, reports, etc. Clearly, however, the official must be responsible for the subject he testifies about. Mr. Sawada was in sales, not production Plaintiff argues that even in selling he had to know the composition of what he sold and the basic manufacturing steps.

This is mere surmise: he may just as well have learned the matter he testified to in the course of preparing to have his deposition taken.

It would seem that, to come even near the Transcontinental rule, plaintiff would have had to show by evidence, not surmise, that the information given was acquired in the regular course of duty. And cf. Sterling International Corporation v. United States, 40 Cust.Ct. 403, Abstract 61422, where an "export manager" was held not qualified to state the staple length of cotton used to produce the imported merchandise, even though he said that he came by the information in the course of performing his duties.

■ The essence of the questions and answers involved is the claim that the plastic sheet material before us contains no filler; that the calcium carbonate found therein, as will appear, was all added not as filler but as a "vesication-adjuster." (The term is explained below.) This goes beyond description of composition and basic manufacturing steps, which plaintiff says the testimony is. It involves the formation and expression of an opinion on a question of chemistry. The statement in *Transcontinental* is more concerned with rules respecting hearsay than with those respecting witnesses' opinions. We doubt but do not definitely determine whether the *Transcontinental* rule might enable a responsible company official, not technically qualified, to give such testimony as is here involved. It suffices to hold that it cannot even be surmised that Mr. Sawada, with his job and with his qualifications, was responsible for the choice of a vesication-adjuster or the determination whether the quantum of calcium carbonate added was the quantum necessary to adjust the vesication properly.

In question 11, the witness was asked which of the three layers (in the sheeting) was most valuable. He replied he believed it was the sponge layer which had been patented. He need not have been a chemist to give this answer.

Objection to answers 10, 12, 13, 14, and 15 is sustained on authority of the *Tower* and *Sterling* cases, supra.

The evidence of the depositions, thus curtailed, indicates that the business of Matsuzaki is to manufacture briefcases, pouches, handbags and the like; that it does a domestic wholesale and an export business; that it purchased sponge-like plastic or sponge-vinyl sheets for use in the manufacture of bags and briefcases, starting in 1957; that in 1958 the president of Skyway Luggage Co. ordered luggage made from that material; that at that time the manufacturer of such sheets was known as Kyokuto Kako; that its present name is Sansuta (Sun-Star); and that in 1957 and 1958 it was the exclusive manufacturer and seller of such sponge-like plastic sheet material.

At the trial, plaintiff called Gerald O. Freeman, a chemist, who was asked to explain certain terms in Mr. Sawada's deposition, and, upon objection, the court ruled that, if the questions and answers explained were stricken from the deposition, the testimony of the witness predicated thereon would also be stricken. It appears that all his testimony, not ruled out at the hearing itself, is in the nature of explaining the inadmissible parts of the deposition. It is excluded except as used for the purpose of explaining terminology used by the court in discussing the Sawada. deposition. We referred to the claim made therein that the calcium carbonate in the middle layer of the material used in the imported luggage was not a filler, nothing being used as a filler, but a "vesication-adjuster." Vesication, Mr. Freeman said, is the process of forming bubbles or cavities, so that the resulting product is full of holes like a sponge. A vesication-adjuster is a material which is added to vary, change, or control the rate of foaming or bubble formation or the size or other characteristic of the bubbles.

Plaintiff then called Harold M. Spiker, assistant chief chemist at the Customs Laboratory in San Francisco, who ran the analysis and issued the laboratory report referred to above, plaintiff's ex-

hibit 5. He testified that he determined the percentage of ash in the resin in the middle foam layer by weighing a sample, burning it down at about 600 degrees Centigrade, and weighing the residue. He determined that the three layers were laminated, that is, cemented together. In order to determine whether or not there was filler material in the middle layer, the amount of ash was found, because if there were no ash, there would have been nothing for the resin to bind. While there could have been materials which would leave no ash, the witness said it was highly improbable in the case of polyvinyl chloride. He had examined a great deal of polyvinyl chloride from Japan in 1959, much of it in sponge form and had found varying quantities of ash in the samples. He had experienced the binding of calcium carbonate in polyvinyl chloride sponge and had treated it as a filler, except when present in very small amounts, less than 1 or 2 percent. In those amounts, it is regarded as an impurity in the material. The witness was doubtful that calcium carbonate could have any purpose in polyvinyl chloride sponge other than as a filler. The witness had performed a chemical analysis of the ash itself and had found nearly all of it was calcium carbonate. He said that calcium carbonate is sometimes used as an opacifier or as a pigment and that a little bit of it could form centers around which the foam bubbles might form. He could not say positively that a portion of the 16.5 percent found in this material was not necessary for the reaction of the foam, but in his experience foam material with a far less percentage of calcium carbonate is often made. He refused to give his opinion as to the minimum of ash content which would indicate a filler was present, but stated that the line set up by the Bureau was 2 percent. Mr. Spiker's worksheets were received in evidence as defendant's exhibit A and he testified that in testing for the presence of calcium carbonate, he followed procedures which are standard with almost any chemist.

The primary issue before the court is whether or not synthetic resin is the chief binding agent in the middle layer of the material of which the suitcases at bar are composed. Plaintiff claims that the resin cannot be the binding agent because there is no filler in the middle layer; that the resin itself constitutes the material of that layer and that chemicals, heat, and pressure are applied to transform it into a sponge form; and that the contrary result reached by the Government chemist is unconvincing because based on an arbitrary rule that, whenever more than 2 percent ash is found, the merchandise is considered as having a filler.

Whether or not the so-called "2 percent rule" could be justified in a borderline case need not here be considered, since the chemist found, and the plaintiff does not dispute, that the percentage of ash (nearly all calcium carbonate) was 16.5 percent. The question is whether plaintiff has established that none of it was present as a filler. Plaintiff's case on this point has been founded on the deposition of Shutaro Sawada, which is excluded in pertinent part.

Even if the evidence we have ruled to be inadmissible were admitted, plaintiff's problem of proof would be substantial. The Government chemist who, however, testified for plaintiff, said that, in his experience, a less proportion of calcium carbonate than 16.5 percent was frequently found in polyvinyl chloride foam material and that the quantity found in such material varied. In the circumstances, this court might well not be satisfied with a mere conclusory statement by a nontechnical witness, even if competent, that the 16.5 percent was all required as a vesication-adjuster, not as a filler. It might expect an explanation from a technically qualified witness as to why a less percentage than 16.5 percent would not suffice to adjust the vesication. We suppose it is obvious that only the amount of calcium carbonate shown to be needed as a vesication-adjuster would be the amount established not to be a filler; i. e., if X is the amount

of vesication-adjuster, the total amount found present less X is still a filler.

In contrast to the kind of evidence presented here, we note Prepac, Inc. v. United States, 43 Cust.Ct. 97, C.D. 2111, where plaintiff introduced the testimony of a witness "qualified as a chemical engineer with special competence in the fields of plastics and dyestuffs, including the nature of the chemical composition of plastics used in materials such as are here involved." The merchandise was a polyvinyl chloride type of plastic sheeting and was claimed to consist only of a synthetic resin, plus an opacifier or pigment for decoration of the sheeting with no filler or "product" of which synthetic resin was a binding agent. The Government chemist had found that the ash content exceeded 8 percent and it appeared that it was then the administrative practice to classify under paragraph 1539(b) where the ash content was 8 percent or more. Plaintiff's witness testified that he had made physical tests and microscopic examinations of the samples and found that most of the residual ash was titanium dioxide, a pigment used to produce the white color of the samples. It was his opinion that the titanium dioxide was present as a pigment, rather than as a filler, on the grounds

> (1) that titanium dioxide costs 50 to 100 times as much as many other inorganic materials that could be used as a filler; (2) that the samples exhibited white or light backgrounds; and (3) that titanium dioxide is used as a pigment, and never, in his experience, as a filler, * * *.

The court stated:

> The testimony of the witness was not contradicted and was not shaken on cross-examination. We are of the opinion that his testimony, both as an expert on the subject of plastics and dyestuffs and upon the reasons advanced by him for his conclusions, may be accepted by the court as establishing the fact that the ash content of exhibits 3–A to 3–F, inclusive, represented pigment, and did not represent filler materials.

The merchandise was, therefore, held not classifiable under paragraph 1539(b).

The record in the instant case, by contrast, does not furnish the court with a basis upon which to conclude that the calcium carbonate in the middle layer is not, in whole or in part, a filler.

The Government chemist (called by plaintiff) gave evidence which was understood by the hearing judge at the time to state that, by instructions he had from the Bureau in Washington and not according to his own opinion, he classified any plastic material as a chief binding agent, etc., if the ash test showed over 2 percent ash. Plaintiff says this establishes that the merchandise was classified according to an improper standard.

The chemist was not the classifying officer and whatever he stated to the collector or appraiser was mere advice not legally binding on them. The collector's reports to the court indicate that, on review pursuant to section 515, Tariff Act of 1930, the "basis of affirmation" was "C.I.E. 1644/59."

The court knows that C.I.E.'s are internal customs documents not for public distribution. If, therefore, it is to take notice of the contents of a C.I.E., it must be because the document was received in evidence. Since C.I.E. 1644/59 was not so received, the court has no knowledge what, if any, rule was prescribed in Washington to guide the action of the collector herein. Suppose the Bureau did prescribe an improper rule, it would still be incumbent on the protesting party to put the facts before the court, and on the court to apply the correct rule to the facts. Not having facts in the case now before us, to show the calcium carbonate was not a filler, the court cannot adjudicate contrary to the official determination, and it must stand. It will not pass on the correctness of a supposed or asserted Bureau rule when it is a moot question, not necessary to adjudication of a pending case. In these circumstances, it would be *obiter dictum* to say what standard we deem controlling, and we save such a pronouncement

for a case when it is needed for the decision.

Plaintiff claims further that paragraph 1539(b) was intended to cover only hard plastics molded under pressure and not a material like soft polyvinyl chloride sponge manufactured by calendering. This argument is based on the language in Senate Report No. 37, 71st Congress, 1st session (quoted in United States v. J. E. Bernard & Co., Inc., 42 CCPA 69, 73, C.A.D. 573):

> The phrase "or of any other product of which any synthetic resin or resinlike substance is the chief binding agent," has been inserted in order to make specific provision for an important group of products known as molded products. These are made by molding under heat or heat and pressure a mixture containing synthetic resin or a resinlike substance and a filler, such as wood flour and pigments.

> Molded products included in this provision cover a wide range and are used chiefly in electrical or mechanical machinery where requirements of electrical insulation properties, mechanical strength, exactness of form or size, and resistance to destructive agents, render them of peculiar importance. These molded products find a multitude of uses.

This argument was made in H. W. Robinson Air Freight Corp. v. United States, 45 Cust.Ct. 102, C.D. 2207, but the court stated that, if such legislative history be indicative of a congressional intent to limit the provision to molded products and to exclude calendered products, it would follow that it was being used to establish an ambiguity in statutory language which had been held to be unambiguous in United States v. J. E. Bernard & Co., Inc., supra. The court stated further (p. 106):

> Moreover, it seems to us that the process of calendering is akin to the process of molding in that it forms the products resulting therefrom by the application of heat and pressure. For an analogous situation in which calendered products were held to be within the purview of paragraph 1539(b), compare the description of the manufacture of the tiles at bar with that of the carbon cloth involved in the case of Burgess Battery Co. v. United States, 43 Cust. Ct. 189, C.D. 2125.

While the decision of this court was reversed in H. W. Robinson Air Freight Corp. v. United States, 48 CCPA 148, C.A.D. 782, it was on the ground that floor tiles, although composed of a product of which a synthetic resin was the chief binding agent, were more specifically provided for as floor coverings under paragraph 1021.

■ Although plaintiff claims that the imported merchandise should be classified under paragraph 1531 by similitude to leather luggage, no affirmative proof other than the sample has been offered to sustain that contention. It was stipulated that the vinyl portion of the suitcases resembled leather in appearance, but not that the imported suitcases most resembled leather suitcases in use or in material. The court takes judicial notice that suitcases are made of various materials and have similar uses. A vinyl suitcase might more nearly resemble in use or in use and material a suitcase of some other material than leather. Cf. Universal Foreign Service et al. v. United States, 46 Cust.Ct. 258, C.D. 2266, which held that antenna washers wholly or in chief value of synthetic resin were properly classified by similitude to manufactures wholly or in chief value of any product of which synthetic resin is the chief binding agent under paragraph 1539(b).

■ The defendant has not pressed the issue of similitude to any extent, but rests its case on the ground that plaintiff has failed to establish that resin was not used as the chief binding agent in the middle layer of the material. Our holding rests on this ground and the similitude issue is not further considered.

The protests are overruled and judgment will be rendered for the defendant.

**OLIVER and WATSON, JJ., concur.**