(R.D. 11690)

MAHER-APP & CO. *v*. UNITED STATES

Entry Nos. 1770; 3494; 3992.

(Decided January 13, 1970)

*Sharp, Partridge, Gants and Perkins* (*James R. Sharp* of counsel) for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Steven Sosnov* and *Frederick L. Ikenson*, trial attorneys), for the defendant.

RAO, Chief Judge: These appeals for reappraisement, consolidated at the trial, involve the return of special dumping duties under the Antidumping Act of 1921, on second quality (oil tempered), $\frac{1}{8}''$ Superswan hardboard, produced by Swanboard Aktiebolag, exported from Sweden during 1953, and entered at the port of New Orleans, Louisiana. (Other hardboard covered by the entry in reappraisement 266340–A is not involved herein.)

On August 26, 1954, the Acting Secretary of the Treasury, in accordance with section 201 of the Antidumping Act of 1921 (19 U.S.C. 160), made a finding of dumping with respect to Swedish hardboard. 89 Treas. Dec. 197, T.D. 53567.

For the purpose of fixing special dumping duties provided for in section 202 of said Act, the appraiser determined the purchase prices and the foreign market values of the merchandise as required by sections 203 and 205.

Plaintiff does not dispute the appraiser's determination of the purchase prices, but contends that his determinations of foreign market value are erroneous. The appraised values and the claimed foreign market values are as follows:

| Reappt. No. | Appraised (per M sq. ft.) | Claimed (per M sq. ft.) |
|---|---|---|
| 266339–A | $34.13 | $23.20 |
| 266340–A | 31.60 | 22.50 |
| 266341–A | 33.07 | 22.50 |

The Antidumping Act of 1921 provides:

> Sec. 205. That for the purposes of this title the foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States), plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in con-

dition packed ready for shipment to the United States, except that in the case of merchandise purchased or agreed to be purchased by the person by whom or for whose account the merchandise is imported, prior to the time of exportation, the foreign market value shall be ascertained as of the date of such purchase or agreement to purchase. In the ascertainment of foreign market value for the purposes of this title no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account.

At the trial plaintiff introduced into evidence a directive issued by the Bureau of Customs to appraising officers for their guidance in appraising certain types of Swedish hardboard as to which appraisement had been withheld. A master list of foreign market values based on information before the Bureau was attached and appraising officers were directed to use such values and certain formulas as to types and sizes of hardboard not listed, in the absence of more specific information. Second quality, ⅛″ Superswan hardboard was not included in the list.

Plaintiff's exhibit 5 is an affidavit of Gunnar Löfgren, who from 1943 to 1964 was managing director of the Swedish Wallboard Manufacturers' Association to which all Swedish companies producing hardboard belonged. He stated that as managing director, he met frequently with officials of the member companies and became familiar with the methods of sales of Swedish hardboard in Sweden and in the export market. He said that during 1953 none of the Swedish hardboard manufacturers freely offered their products to all purchasers in Sweden but sold only to selected distributors. He recalled that it was the policy of Swanboard Aktiebolag and other Swedish manufacturers to sell as much as possible in foreign markets and that they offered to sell and sold to all purchasers at prices established by their companies from time to time. He added that prices gyrated considerably in that period.

Exhibits 2, 3, and 4 are affidavits of Tore Valter Rydberg, who has been employed by Swanboard Aktiebolag since 1944, was office manager in 1953, and is presently director. Mr. Rydberg stated that during the time he was office manager, he participated in the decisions made from time to time as to the prices at which hardboard was to be sold to buyers in the United States and offered to purchasers in third countries. In his present capacity as director, all records of the company are in his custody and retained under his direction.

In exhibit 3, Mr. Rydberg stated:

12. At no time during 1953 did Swanboard Aktiebolag freely offer its hardboard products for sale to all buyers in Sweden. Instead such products were offered for sale only to a selected list

of wholesale distributors. We did not offer hardboard for sale to others than those included on the list. This was not true of our sales to third countries. As to third countries we agreed from time to time among the management of the company as to the prices at which the sales department would be permitted to offer hardboard in the usual wholesale quantities for sale to third country purchasers and standing instructions were given to the sales department authorizing them to sell usual wholesale quantities to all purchasers in third countries at the prices agreed on by management. The sales department had no authority to sell to countries other than the United States at other than the prices thus set by management from time to time. I recall that in those days usual wholesale quantities varied from a little under 10,000 square feet to somewhat over 100,000 square feet.

Mr. Rydberg further stated that counsel had called to his attention the fact that the master list showed no foreign market value for ⅛" second quality Superswan in 1953, and asked him to review the company's invoices to determine whether there were any sales to third countries. He therefore caused the records of Swanboard for 1953 to be searched and found that "although sales of second quality Superswan to third countries were limited during that year there were three sales of ⅛" second quality Superswan in standard sizes made to purchasers in England during 1953." Copies of the five invoices covering these sales were attached to exhibit 2. In exhibit 3, affiant states:

16. A search of our records fails to disclose that there were any sales of second quality Superswan made or confirmed to third country buyers in 1953 other than the three orders referred to above. While I have no personal recollection of these three orders, based on my experience in 1953 and my contact with the sales department during that year I am informed and believe that in accordance with the standing policy maintain [sic] to my knowledge throughout 1953, the prices for second quality Superswan as shown in the above refer to invoices for third country sales were the prices freely offered to all third country buyers at or about the time in 1953 that the company accepted the three orders referred to in the five invoices.

The three sales referred to are as follows:

1. To William Evans & Company, order No. 7562, confirmation of order No. 4030, April 7, 1953. The goods shipped against the order were covered by Swanboard's invoices dated April 17, 1953 and May 8, 1953, each of which refers to the Evans order number and the Swanboard confirmation of order number. The total quantity covered by those shipments was 63,168 sq. ft. of "Hard Wallboard X sekunda". Mr. Rydberg stated that to his personal knowledge second quality Superswan hardboard was so designated.

2. To N. R. Burnett, Ltd., order No. 7574, confirmation of order No. 4062, April 22, 1953. The goods shipped against this order were covered by Swanboard's invoices dated July 16, 1953 and September 28,

1953, each of which refers to the Burnett order number and the Swanboard confirmation of order number. The total quantity was 90,240 sq. ft. of "HARD WALLBOARD X sekunda".

3. To N. R. Burnett, Ltd., order No. 7818, confirmation of order No. 4548, October 22, 1953. The goods shipped against this order were covered by Swanboard's invoice dated December 15, 1953 which refers to both the Burnett order number and the Swanboard confirmation of order number. The quantity shipped was 30,048 sq. ft. of "HARD WALLBOARD X sekunda".

Attached to exhibit 2 is a calculation made by the affiant listing, *inter alia*, as to each invoice, the c.i.f. prices in English pounds, the c.i.f. prices per thousand sq. ft. in dollars ($29.09 each for three orders, $30.00 for one order, and $28.36 for one order), and amounts for commission, ocean freight, insurance, forwarding fees, inland freight, and packing. F.o.b. mill prices are calculated at $19.45 for three orders, $18.46 for one order, and $18.75 for one order. In another calculation, written in ink deductions are made only for freight, insurance, and forwarding fees, resulting in prices of $25.50 for three orders, $24.56 for one and $24.77 for another. After alluding to the analysis sheet, Mr. Rydberg concludes:

13) The foreign market values for ⅛'' second quality Superswan in standard sizes were, therefore, as set forth below instead of as found by the appraisers on the basis of the incomplete 1953 master list on the basis of which the appraisers made their appraisals of that size and quality board for orders confirmed in 1953:

April 7, 1953—Oct. 21, 1953—$25.50 net packed
Oct. 22, 1953—Dec. 31, 1953—$24.77 net packed

In exhibits 3 and 4, Mr. Rydberg discussed the analysis further and stated that confirmation dates of the three orders, insurance, forwarding fees, inland freight, and packing information were obtained from his company's books and records regularly maintained by his company in the normal course of its business in 1953, and that the prevailing ocean freight rates were taken from his company's "prevailing ocean freight book". Invoice dates, quantities, c.i.f. prices and discounts were taken from the invoices.

With regard to packing, the affiant stated:

* * * I find that our records disclose that the goods covered by the 5 invoices attached to my former affidavit were shipped in crates. The $3.55 packing charge was used by me in the preparation of Exhibit 6 in accordance with paragraph 3 of Swanboard's 1953 master list which I had been informed was circulated through the Customs Information Exchange to the appraisers at the various ports to aid them in their appraisement of shipments of goods with confirmed dates in the calendar year 1953.

Currency conversions from Swedish kronor and British pounds were made at rates which affiant believed were those certified to the Secretary of the Treasury by the Federal Reserve Board for duty purposes.

At the trial plaintiff called Harriet Clark Pope, an employee in the office of plaintiff's counsel, who testified that she had gone to Gothenburg, Sweden, for the purpose of examining the records of Swanboard Aktiebolag as to sales to third countries in 1953. She said that Mr. Rydberg had assigned Mr. Henry Palm, assistant sales manager, to search the records and that it had taken him over a week to get them as they were at the mill. She added:

> * * * They did not have complete records for that year. The only thing they had left were these actual invoices plus a listing of their orders and order dates in each book.

Although Miss Pope did not read or speak Swedish, she examined the sales records and selected the five invoices attached to exhibit 2 and had copies made of them. She stated variously that the computation attached to exhibit 2 was prepared by her or while she was present; that she did not aid or assist in that computation; that she made a separate computation of her own by using the directions on the 1953 Swanboard master list.

Plaintiff claims that the foreign market value of the imported merchandise could not be based on sales in Sweden for home consumption because it was not freely offered or sold to all purchasers in the home market during the period here involved; that like merchandise was freely offered or sold to all purchasers for exportation to countries other than the United States, and that the prices at which the merchandise was so offered or sold are represented by the three sales above mentioned. The values claimed by plaintiff are somewhat different from those given by Mr. Rydberg in exhibit 2, paragraph 13, *supra*. For instance, plaintiff uses the f.o.b. mill price of $19.45 and adds $2.70 for actual packing and $1.05 for inland freight to arrive at the claimed value of $23.20 for the merchandise in reappraisement 266339–A. A commission of $0.17 which was not subtracted by Mr. Rydberg is thus deducted. Whether this was a buying or selling commission does not appear. A similar computation was made to arrive at the claimed values for the balance of the merchandise.

Defendant contends that plaintiff has failed to prove that such or similar merchandise was not offered for sale to all purchasers for home consumption, and that, even assuming that the absence of home market sales had been established, plaintiff has failed to prove that the claimed foreign market value is the price at which such or similar merchandise was freely offered or sold to all purchasers in the usual

wholesale quantities and the ordinary course of trade for exportation to countries other than the United States.

Since the so-called master list did not contain any value for second quality ⅛″ Superswan, the appraisement must have been based on other information. No inference may be drawn as to how the appraiser arrived at his finding of value. *Elof Hansson, Inc.* v. *United States*, 55 Cust. Ct. 551, Reap. Dec. 11041 (1965). Although it is a finding made pursuant to the Antidumping Act of 1921, it is presumed by statute to be correct. 19 U.S.C. 169; 28 U.S.C. 2633. The burden thus rests upon the plaintiff in the instant case to establish affirmatively by competent, substantial evidence that the foreign market values found by the appraiser are erroneous and that the claimed values are correct. *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495 (1952); *United States* v. *Fischer Scientific Co.*, 44 CCPA 122, C.A.D. 648 (1957).

In support of its position that the merchandise was not freely offered or sold to all purchasers for home consumption in Sweden, plaintiff maintains that it appears from the depositions of Mr. Löfgren and Mr. Rydberg that the Treasury Department determined there was no Swedish home market value after an investigation in 1953 and 1954 and directed the use of third country prices where available. The directive to customs officers (exhibit 1) refers to foreign market value but does not state that it was predicated on sales to third countries. Mr. Löfgren states that there was an investigation and that he was advised that if the goods were not freely sold in Sweden, third country prices would apply. Subsequently, at the request of counsel, he asked the manufacturers to furnish detailed lists of foreign sales for transmission to the Bureau of Customs. While these statements indicate that the Bureau of Customs was gathering information, they do not establish what conclusions were drawn by the Bureau as to the proper basis of foreign value.

In further support of its position that foreign market value cannot be predicated upon home market sales, plaintiff relies on Mr. Rydberg's statement, in exhibit 3, that in 1953 Swanboard Aktiebolag offered its hardboard products for home consumption only to selected wholesale distributors. At that time, Mr. Rydberg was office manager, and, according to his affidavit (exhibit 4) his duties included participation in decisions as to the prices at which hardboard was to be sold to buyers in the United States and to purchasers in third countries. There is no evidence that he had anything to do with sales for home consumption or had any personal knowledge thereof or learned about them in the course of performing his duties. There is no indication that he consulted books and records to ascertain that information, nor is there

any evidence that there were any such books and records made in the ordinary course of business. His statements as to sales practices in the Swedish home market are, therefore, of little, if any, probative value. *Wm. A. Hausman Co., Inc.*, v. *United States*, 57 Cust. Ct. 391, C.D. 2828, 260 F. Supp. 860 (1966).

According to the affidavit of Mr. Löfgren, also relied on by plaintiff, it was the practice of all manufacturers of hardboard in Sweden to sell only to selected distributors. However, his information was derived from meetings with officials of the companies belonging to the Swedish Hardboard Manufacturers Association. There is nothing in his affidavit to indicate the purpose of the association or his duties as managing director. Even where corporate officials are permitted to testify as to matters learned through various conferences, letters, and reports (*Transcontinental Petroleum Co.* v. *Interocean Oil Co.*, 262 Fed. 278 (1919)), their knowledge must have been obtained through activities within the scope of their duties. *Wm. A. Hausman Co., Inc.* v. *United States, supra.* The evidence does not show that Mr. Löfgren had anything to do with formulating the policy of the member companies or that he had any firsthand knowledge of their actual operations. Therefore, his testimony is hearsay.

Furthermore, the affidavits even if taken at their face value state no more than that the manufacturers sold their products only to selected distributors. There is not a scintilla of evidence as to the sales practices of the distributors. Where the market is restricted at the primary or manufacturers' level, but the merchandise is freely offered or sold by distributors or wholesalers to all purchasers in the usual wholesale quantities in the ordinary course of trade in accordance with the statutory definition of foreign value, their sales prices are acceptable as a basis on which to find foreign value. *United States* v. *H. W. Robinson & Co. et al.*, 19 CCPA 274, T.D. 45436 (1932); *Glanson Co.* v. *United States*, 31 Cust. Ct. 473, A.R.D. 33 (1953);[1] *A. N. Deringer, Inc.* v. *United States*, 34 Cust. Ct. 452, Reap. Dec. 8390 (1955).[2] In the *Glanson* case the court stated (p. 475):

> It would appear that the evidence adduced before the trial court did not necessitate so conclusive a determination as that no foreign value existed for the merchandise at bar. That such a value could not be found from evidence reflecting the manufacturer's sales, because such sales were made at prices which varied solely with

---

[1] Decided on remand *Glanson Co.* v. *United States,* 40 Cust. Ct. 644, Reap. Dec. 9047 (1958), decided on rehearing 41 Cust. Ct. 510, Reap. Dec. 9208 (1958), affirmed *United States* v. *Glanson Co.* 43 Cust. Ct. 601, A.R.D. 110 (1959), reversed 47 CCPA 110, C.A.D. 740 (1960).

[2] Case restored to calendar *A. N. Deringer, Inc.* v. *United States,* 37 Cust. Ct. 591, Reap. Dec. 8708 (1956), decided on rehearing 40 Cust. Ct. 810, Reap. Dec. 9145 (1958), affirmed *United States* v. *A. N. Deringer, Inc.,* 42 Cust. Ct. 711, A.R.D. 102 (1959), appeal dismissed.

respect to the category of the purchaser, and no one price could be selected as the freely offered price to all purchasers, does not necessarily import that there was no foreign value for the instant merchandise.

The proven fact is that the wholesale trade constituted one of the categories of purchasers to whom the manufacturer sold its wares. Whether that class of trade offered to sell cribbage boards at prices which would, consistent with the provisions of the foreign value statute, enable the selection of a freely offered price to all purchasers for home consumption, is not of record. Until such sales are ruled out, the categorical denial of the existence of a foreign value may not be asserted. We cite the case of *United States* v. *H. W. Robinson & Co., State Forwarding Co., & Edgar S. Bibas*, 19 C.C.P.A. (Customs) 274, T.D. 45436, as authority for the proposition that resale prices of wholesalers are acceptable as a basis from which to derive a foreign value, if such prices accord with the statutory requirements of being freely offered for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade.

It follows that the evidence presented in this case is insufficient to negate the existence of a foreign market value predicated upon sales for home consumption in Sweden.

In addition, the record is insufficient to establish that the merchandise was freely offered for exportation to countries other than the United States to all purchasers in the ordinary course of trade or at the prices claimed.

According to Mr. Rydberg, from time to time the sales department was permitted to sell hardboard to all purchasers at prices agreed upon by the management. To what extent such permission was given or offers circulated among prospective purchasers was not disclosed. It does not appear how often prices were set and whether they remained stable for a period of time or were fixed for each sale. Mr. Löfgren's affidavit indicated, for instance, that prices gyrated considerably during 1953.

Three sales were disclosed through a search of the company's records. According to the analysis attached to exhibit 2 the prices varied: the sale of April 7, 1953 was at a c.i.f. unit price of $29.09; one sale on April 22 was at that price and the other at $30.00, and the sale of October 22, 1953 was at $28.36. Mr. Rydberg had no personal recollection of these three sales and based his conclusion that the prices represented freely offered prices on his contact with the sales department during 1953, on what he was informed and believed to be the standing policy maintained by the company. However, at the beginning of his affidavit he had stated that the prices were fixed from time to time. Therefore it is not clear what the standing policy was, nor that offers

were made to all purchasers in the ordinary course of trade. The dates of exportation of the within merchandise are August 24, 1953, November 13, 1953 and December 14, 1953. Therefore, unless the prices remained constant, sales prices in April or October of 1953 do not establish dutiable value. *United States* v. *A. F. Stauff & Co. for a/c B. Dickson & Co.*, 11 Cust. Ct. 458, Reap. Dec. 5949 (1943).

Mr. Rydberg states that the records of the company had been searched and that no other sales to a third country in 1953 had been disclosed. However, Miss Pope testified that it had taken a week or more to get the records of the company and that the records for 1953 were not complete, but consisted of the five invoices plus a listing of orders and order dates in each book. Thus it has not been satisfactorily established that the three sales mentioned were the only sales made to third country purchasers in 1953. If these were the only sales, they may well have been sporadic.

On the basis of the entire record, I find that the plaintiff has not presented sufficient evidence to overcome the presumption of correctness attached to the appraiser's finding of value.

I find as facts:

1. The merchandise involved herein consists of ⅛'' Superswan (oil tempered) hardboard, exported from Sweden during 1953.

2. The Acting Secretary of the Treasury on August 26, 1954, issued a statutory finding of dumping (T.D. 53567) pursuant to section 201 of the Antidumping Act of 1921.

3. For the purpose of calculating special dumping duties in accordance with section 202 of the said Antidumping Act, the appraiser determined the purchase prices as defined in section 203, and the foreign market value, as defined in section 205 of said act.

4. The appraiser's determinations of purchase prices as shown in the appraisement reports herein are not in dispute; only the appraised foreign market value is challenged.

5. The evidence fails to establish that the manufacturer did not offer or sell such or similar hardboard for home consumption in Sweden to all purchasers in the ordinary course of trade; that it does establish that the manufacturer sold to distributors, but it fails to show whether or not the distributors offered and sold the merchandise to all purchasers in the usual wholesale quantities and in the ordinary course of trade.

6. The evidence does not establish that at or about the dates of exportation, such or similar hardboard was freely offered to all purchasers for exportation to countries other than the United States in the ordinary course of trade at the prices claimed.

7. The evidence is insufficient to establish any other foreign market value than that determined by the appraiser.

I conclude as matters of law:

1. The presumption of correctness attaching to the findings of value by the appraiser has not been overcome.

2. The foreign market values at unit purchase prices on the day of purchase, as found by the appraiser pursuant to the Antidumping Act of 1921, section 205, were in accordance with the statutory provisions and are affirmed.

Judgment will be entered accordingly.