(A.R.D. 267)

James C. Goff Company ⎱ *v.* UNITED STATES
Foreston Coal Co. of Mass. ⎰

Entry Nos. 497 ; F82.

First Division, Apellate Term

(Decided January 27, 1970)

*Felix C. Lourie (Jerome A. Lewis* of counsel) for the appellants.
*William D. Ruckelshaus,* Assistant Attorney General (*Frederick L. Ikenson,* trial attorney), for the appellee.

Before WATSON, MALETZ, and RE, Judges

PER CURIAM : This application for review involves the assessment of special dumping duties under the Antidumping Act of 1921, as amended, on gray portland cement exported from Sweden during 1959. The background is this: In April 1961, the United States Tariff Commission notified the Acting Secretary of the Treasury that an industry in the United States was being, or was likely to be, injured by reason of the importation of gray portland cement from Sweden. Later that month, the Assistant Secretary of the Treasury, pursuant to section 201(a) of the Antidumping Act, as amended, made public the finding of dumping.

For purposes of fixing the special dumping duties provided for in section 202 of the Antidumping Act, the government appraisers determined the purchase prices and the foreign market values of the merchandise, as required by sections 203 and 205, respectively, of that act. Appellants (plaintiffs below) did not dispute the appraisers' determination of purchase prices under section 203 but contended that they should have determined lower foreign values under section 205 by deducting certain allowances specified in section 202(b) and that their ascertainment of special dumping duties was therefore erroneous. The trial judge (Judge Wilson) held that appellants had not overcome the statutory presumption of correctness attendant upon the appraisers' determination and hence affirmed the appraised foreign market values. *James C. Goff Company et al.* v. *United States,* 61 Cust. Ct. 506, R.D. 11581 (1968). Appellants insist here that this decision

is in error.[1] We do not agree. Rather we are in agreement with the decision and therefore affirm. Judgment will be entered accordingly.

Since Judge Wilson's opinion, findings and conclusions fully express our views, we deem it appropriate to adopt the same as the basis for our judgment in this case. They are as follows:

WILSON, Judge: The above two appeals were not by formal order specifically consolidated for purposes of trial. However, counsel tried and briefed the appeals as though consolidated, and the court will dispose of the appeals on that basis.

The imported merchandise consists of so-called Gullhögens Standard Portland Cement conforming to type I ASTM C–150–55, and Gullhögens Rapid Hardening Cement conforming to type III ASTM C–150–55. This cement was manufactured by Gullhögens Cement (Stockholm) AB, at its plant in Skovde, Sweden. Both types of cement were imported in each appeal.

The cement in R62/3673 was exported by Gullhögens on September 4, 1959, and was entered at Providence, R.I., for the account of James C. Goff Company. The cement in R63/4270 was exported on May 22, 1959, by Wingårdh & Co., which firm, according to exhibit A, occupies the same local address as Gullhögens and is closely related thereto, but is a separate legal entity. It purchases the merchandise outright from Gullhögens and resells at a profit. This merchandise was entered at Fall River, Mass.

The appraisers at both ports of entry appraised the cement under section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165. Such values are not contested and will be *affirmed*.

The appraisers also reported the foreign market values on the respective dates of purchase as well as the unit purchase prices under the Antidumping Act of 1921 (hereinafter ADA), sections 205 and 203 [19 U.S.C.A., sections 160, etc.], as amended by the Customs Simplification Act of 1954, 89 Treas. Dec. 242, T.D. 53599, which resulted in special dumping duties being imposed under section 202(a) of the antidumping act.

Plaintiffs' counsel defines the issue herein as follows:

> * * * we concede that the legal requirements of the statute were met with regard to the investigation itself.

> Our claim here is that a lower foreign market value should have been found by the Appraiser. We have no other objection in this particular case. [R. 2.]

---

[1] Appellants have not submitted a brief in support of their application for review; instead they have merely resubmitted the brief that they had previously filed in the trial proceedings. *Cf.* rule 31.

In plaintiffs' brief, page 1, counsel concedes that the appraisers' determination of purchase price under section 203 is *not* challenged, and that—

> * * * The sole issue presented by these appeals is the proper foreign market value, as defined in Section 205, and adjusted as specified in Section 202(b) for the purpose of comparison with purchase price and ascertainment of special dumping duty under Section 202(a). * * *

The defendant contends that plaintiffs have failed to overcome the presumption of correctness attaching to the foreign market values returned by the appraisers; that plaintiffs' claims are not supported by substantial competent evidence; and that plaintiffs have failed to establish the validity of the "adjustment" they claim should be allowed in determining the foreign market values.

Because of plaintiffs' concession that the legal requirements of the statute relating to dumping were met, and there is no evidence of record to the contrary, the court holds that the investigation by the U.S. Tariff Commission shows, and the determination of the Secretary of the Treasury establishes, that a class or kind of foreign merchandise, to wit, cement from Sweden, is being, or is likely to be sold in the United States or elsewhere at less than its fair value. The finding of dumping is therefore correct pursuant to section 201 (a)(c), ADA, as amended [19 U.S.C.A., section 160(a)(c)].

STATUTES INVOLVED

SPECIAL DUMPING DUTY

Section 202 [19 U.S.C.A., section 161]:

> Amount of duty to be collected; determination of foreign market value of goods

> (a) In the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary of the Treasury has made public a finding as provided for in section 160 of this title, entered, or withdrawn from warehouse, for consumption, not more than one hundred and twenty days before the question of dumping was raised by or presented to the Secretary or any person to whom authority under said section has been delegated, and as to which no appraisement report has been made before such finding has been so made public, if the purchase price or the exporter's sales price is less than the foreign market value (or, in the absence of such value, than the constructed value) there shall be levied, collected, and paid, in addition to any other duties imposed thereon by law, a special dumping duty in an amount equal to such difference.

> (b) In determining the foreign market value for the purposes of subsection (a) of this section, if it is established to the satisfaction of the Secretary or his delegate that the amount of any difference between the purchase price and the foreign market

value (or that the fact that the purchase price is the same as the foreign market value) is wholly or partly due to—

(1) the fact that the wholesale quantities, in which such or similar merchandise is sold or, in the absence of sales, offered for sale for exportation to the United States in the ordinary course of trade, are less or are greater than the wholesale quantities in which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States),

(2) other differences in circumstances of sale, or

(3) the fact that merchandise described in subdivision (C), (D), (E), or (F) of section 170a(3) of this title is used in determining foreign market value,

then due allowance shall be made therefor.

(c) In determining the foreign market value for the purposes of subsection (a) of this section, if it is established to the satisfaction of the Secretary or his delegate that the amount of any difference between the exporter's sales price and the foreign market value (or that the fact that the exporter's sales price is the same as the foreign market value) is wholly or partly due to—

(1) the fact that the wholesale quantities in which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the United States in the ordinary course of trade, are less or are greater than the wholesale quantities in which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States),

(2) other differences in circumstances of sale, or

(3) the fact that merchandise described in subdivision (C), (D), (E), or (F) of section 170a(3) of this title is used in determining foreign market value,

then due allowance shall be made therefor.

### Foreign Market Value

Section 205 [19 U.S.C.A., section 164]:

Determination of foreign market value

For the purposes of sections 160–171 of this title the foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for home consumption (or, if not so sold

or offered for sale for home consumption, or if the Secretary determines that the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an inadequate basis for comparison, then the price at which so sold or offered for sale for exportation to countries other than the United States, plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States, except that in the case of merchandise purchased or agreed to be purchased by the person by whom or for whose account the merchandise is imported, prior to the time of exportation, the foreign market value shall be ascertained as of the date of such purchase or agreement to purchase. In the ascertainment of foreign market value for the purposes of sections 160–171 of this title no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account. If such or similar merchandise is sold or, in the absence of sales, offered for sale through a sales agency or other organization related to the seller in any of the respects described in section 166 of this title, the prices at which such or similar merchandise is sold or, in the absence of sales, offered for sale by such sales agency or other organization may be used in determining the foreign market value.

## DUTIES OF APPRAISERS

Section 209 [19 U.S.C.A., section 168]:

### Appraisal and report to collector

In the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary of the Treasury has made public a finding as provided in section 160 of this title, and as to which the appraiser or person acting as appraiser has made no appraisement report to the collector before such finding has been so made public, it shall be the duty of each appraiser or person acting as appraiser, by all reasonable ways and means to ascertain, estimate, and appraise (any invoice or affidavit thereto or statement of constructed value to the contrary notwithstanding) and report to the collector the foreign market value or the constructed value, as the case may be, the purchase price, and the exporter's sales price and any other facts which the Secretary may deem necessary for the purposes of sections 160–171 of this title.

## APPEALS AND PROTESTS

Section 210 [19 U.S.C.A., section 169]:

### Appeals, etc., from determinations of appraisers

For the purposes of sections 160–171 of this title, the determination of the appraiser or person acting as appraiser as to the foreign market value or the constructed value, as the case may

be, the purchase price, and the exporter's sales price, and the action of the collector in assessing special dumping duty, shall have the same force and effect and be subject to the same right of appeal and protest, under the same conditions and subject to the same limitations; the United States Customs Court, and the Court of Customs and Patent Appeals shall have the same jurisdiction, powers, and duties in connection with such appeals and protests as in the case of appeals and protests relating to customs duties under existing law.

The plaintiffs introduced two affidavits made by Lennart Pettersson, sales manager of Gullhögens, which were sworn to before the American Consul in Gotenborg, Sweden, on February 13, 1963, and March 8, 1963, respectively. They were received in evidence as exhibits 1 and 2. Plaintiffs also introduced a copy of a letter, without date, from Lawton M. King, Acting Commissioner of Customs, addressed to Eugene R. Pickrell, which was received as exhibit 3. The defendant introduced a certified copy of a report dated May 20, 1959, made by Arno Hellthaler, Customs Representative at Frankfurt/M, Germany, which was received as exhibit A. Oral testimony was not introduced by either party.

The evidence (all documentary) may be summarized as follows:

In plaintiffs' exhibit 1, Pettersson alleges that he has been sales manager of Gullhögens since January 1, 1952. Their plant and offices are at Skovde, Sweden, which is the principal market for the sale of types I and III cement for home consumption and for all export sales. They produce and sell portland cement. His duties are to supervise sales which include cement types I and III for home consumption and for export to foreign countries, including the United States. He sees and approves all offers for sale and sales of said cement. Gullhögens maintains eight silos in different areas outside Skovde in addition to silos in said city. All said silos are primarily used to facilitate the distribution of type I, and in some cases type III, cement, and for storage for a limited period of time. These types of cement are sold for home consumption bagged and in bulk, the latter being shipped from plant to the silos by rail and road. The cement is then delivered by trucks holding 1 to 3 cylindrical containers of cement, each cylinder normally holding approximately 5 tons. Merchandise for home consumption is sold at delivered prices to consumers, warehouses or mixing plants in 85 of 94 existing consumer sales areas. The average delivered prices of both bagged and bulk cement during 1959 were Sw. Crowns 75.96.

Appended to exhibit 1 are photostatic copies of 1 percent of purported invoices covering the 1959 sales of types I and III for home consumption in Sweden. Sales of such types for home consumption during 1959 were made at a cash discount of 2 percent. The affiant

further alleges that the cost of operation, maintenance and depreciation of the silos during 1959 was Sw. Crowns 17.85 per metric ton, and the cost of maintenance and delivery equipment during 1959 in the sale of such types for home consumption was Sw. Crowns 11.25 per metric ton. The affiant further states that the administrative, selling and interest costs of such types for home consumption during 1959 were Sw. Crowns 4.06 per metric ton in excess of the commission paid to Daniel M. Hicks, Inc., of New York, N.Y., in respect to sales for export to the United States. Advertising costs for home consumption during 1959, the affiant alleges, were Sw. Crowns 0.46 per metric ton. During 1959 Gullhögens sold 222.92269 metric tons of type I and 1.971 metric tons of type III in bags for home consumption, and 225.529 metric tons of type I and 1.003 metric tons of type III in bulk for home consumption.

The affiant sets forth in exhibit 1 the dates, quantities and prices of total sales of types I and III for export to the United States during 1959, with appended copies of such sales as well as the dates, quantities and prices of total sales of said types for export to foreign countries other than the United States during 1959 with appended copies of such sales. He alleges that the wholesale quantity in the sale for home consumption of types I and III, either bagged or in bulk, was 15 metric tons, and the usual wholesale quantity sold during 1959 of the same types to the United States was 1.822 metric tons and 802 metric tons, respectively, for types I and III.

In exhibit 2, Pettersson refers to his previous affidavit, exhibit 1, and states that it would have been impractical to append thereto a larger quantity than 1 percent of the number of sales during 1959 of types I and III because they were so numerous, but alleges the sales slips attached are representative of the sales for home consumption. Furthermore, the prices do not vary according to quantity. The usual wholesale quantity sold for home consumption was 15 metric tons of those types. He appends translations from Swedish to English covering the 1 percent of invoices attached to exhibit 1. He states the average prices per metric ton of those types of cement shown in the invoices during 1959 for home consumption delivered at the plant in the usual wholesale quantity of 15 metric tons to be Sw. Crowns 70.18; 61.69; 84.48 and 69.25, respectively, for type I in bags; type I in bulk; type III in bags; and type III in bulk. He also sets forth the unit prices per metric ton covering the sales made for export to the United States mentioned in exhibit 1 for cement sold during 1959 of types I and III, as well as the unit prices per metric ton covering sales made for export to foreign countries other than the United States during 1959.

The affiant in exhibit 2 sets forth the weighted average price for home consumption in bags during 1959 as 70.34 Sw. Crowns per metric

ton. The witness also stated that the cost of bags for type I for home consumption was 6.27 Sw. Crowns per metric ton. The weighted average price at the plant for bulk cement of type I and bagged type I, less cost of bags, was 62.675 Sw. Crowns per metric ton. The weighted average price for type III for home consumption during 1959 sold in bags was 82.98 Sw. Crowns per metric ton according to the affidavit. The cost of the bags for type III for home consumption during 1959 was 9.87 Sw. Crowns per metric ton and the weighted average price at the plant for bulk type III and bagged type III, less cost of bags, was 71.93 Sw. Crowns per metric ton. He also sets forth that a quantity discount of at least 5 percent is allowed for sales of type I for export to the United States when at least 1,000 metric tons are bought. At least 5 percent is also allowed for sales of type III for export to the United States when at least 800 metric tons are bought.

The statute pertinent to the situation at bar (28 U.S.C.A., section 2633) reads:

> The value found by the appraiser shall be presumed to be the value of the merchandise. The burden shall rest upon the party who challenges its correctness to prove otherwise.

This burden, it is well settled, is twofold. To establish a *prima facie* case, the plaintiffs must first prove affirmatively that the appraiser erred in computing the foreign market values, and then establish by competent substantial evidence the correct values claimed. *United States* v. *Fisher Scientific Co.*, 44 CCPA 122, C.A.D. 648. Further, in an antidumping case the presumption of correctness attaching to the appraisement extends to the appraiser's determination of the proper foreign market value found in accordance with sections 202 and 205 of the Antidumping Act of 1921, as amended, for the purpose of ascertaining the special dumping duties pursuant to section 202(a) of the said act. (19 U.S.C.A., section 169.)

Thus, in the instant case, the plaintiffs must establish affirmatively, by competent substantial evidence, that the appraisers erred in computing the adjusted foreign market values which were used as the basis for assessing the dumping duties against the portland cement types I and III and, furthermore, that their claimed adjusted foreign market values for the said merchandise were correct.

While there is no dispute that the purchase price as found by the appraisers is correct, and that foreign value is the proper basis of appraisement, plaintiffs contend that certain allowances specified in section 202(b) should have been deducted from the appraised foreign value in order to arrive at a proper foreign value as defined in section 205, *supra.* Under the antidumping statute, the amount of dumping duty prescribed shall be on the basis of the difference between the lower

unit purchase price in the foreign market and the higher unit price as appraised on the basis of foreign value.

The plaintiffs contend that in the computation of the foreign market value, in addition to a cash discount of 2 percent and a quantity discount of 5 percent and other usual allowances, further allowances should have been permitted for "other differences in circumstances of sale" as provided by section 202(b)(2) for items of expense incurred in home market sales which were not incurred in sales to the United States. The plaintiffs' assumption that such allowances were not taken into account by the appraisers is unfounded. There is a presumption that the appraisers found every existing fact necessary to sustain their appraisements. The presumption is that the appraisements included such allowances. *E. I. du Pont de Nemours & Co. v. United States*, 27 CCPA 146, C.A.D. 75; *White Lamb Finlay, Inc. v. United States*, 29 CCPA 199, C.A.D. 192.

The nature of the case at bar is such that it requires testimony on cost breakdown and allocations of costs to various operations in selling types I and III cement, in bags and in bulk, in the home market and in sales for export. The court recognizes that the plaintiffs' burden to disprove the appraisements by competent, substantial evidence is onerous. However, as pointed out in defendant's brief Lennart Pettersson who executed two affidavits (plaintiff's exhibits 1 and 2) was not properly qualified to testify as to items covering the cost of operations, maintenance and depreciation of the company's silos, cost of maintenance of delivery equipment (comprised of trucks and railway cars), and the administrative, selling and advertising costs set forth in paragraphs 9 through 12 of exhibit 1. Nor was he qualified to testify as to the alleged costs set forth in paragraphs 12, 15, 19, 20, 21, and 24 of exhibit 2. These are cost items requiring the testimony of an expert on costs. Mr. Pettersson was not such an expert, but was the supervisor of sales, whose duties consisted of seeing and approving sales of cement. The record does not establish that his statements concerning cost items are within his duties, knowledge or experience. Mr. Pettersson's testimony, therefore, does not constitute competent, substantial evidence such as that essential to the plaintiffs' *prima facie* case. In support of this view see *Wm. A. Hausman Co., Inc. v. United States*, 57 Cust. Ct. 391, C.D. 2828. In that case, objection was sustained to certain questions and answers in a deposition taken of Mr. Sawada, a witness in Japan, whose function as head of a business section of a company was to sell their products. The questions related to a chemical composition. The court stated at pages 396 and 397:

> There is nothing to show Mr. Sawada was a chemist. Normally the testimony of a person not a chemist on the chemical composition of a product is inadmissible. *United States v. C. J. Tower &*

*Sons*, 38 CCPA 131, C.A.D. 450. Plaintiff offers in its brief no authority to show that this case does not govern, but possibly it intends to invoke and broaden the rule this division recently stated in *Royal Cathay Trading Co. et al.* v. *United States*, 56 Cust. Ct. 371, C.D. 2662, that a responsible executive concerned with designing, specifying, importing, promoting, and selling certain merchandise can testify what its uses are. We referred in that opinion to the classic statement in *Transcontinental Petroleum Co.* v. *Interocean Oil Co.*, 262 F. 278, 282 (8th Cir. 1919), upholding the competency of testimony by officials of large corporations with respect to matter concerning the operations of their companies they have learned through conferences, letters, reports, etc. *Clearly, however, the official must be responsible for the subject he testifies about.* Mr. Sawada was in sales, not production. Plaintiff argues that even in selling he had to know the composition of what he sold and the basic manufacturing steps. This is mere surmise: he may just as well have learned the matter he testified to in the course of preparing to have his deposition taken. *It would seem that, to come even near the Transcontinental rule, plaintiff would have had to show by evidence, not surmise, that the information given was acquired in the regular course of duty.* And cf. *Sterling International Corporation* v. *United States*, 40 Cust. Ct. 403, Abstract 61422, where an "export manager" was held not qualified to state the staple length of cotton used to produce the imported merchandise, even though he said that he came by the information in the course of performing his duties. [Emphasis supplied.]

On another point of essential proof, the plaintiffs have attached to their exhibit 1 certain copies of invoices allegedly representing 1 percent of sales of types I and III cement sold in 1959 for home consumption in Sweden. The affiant's assertions that this 1 percent of the invoices is representative of all sales for 1959 and that they show average prices per metric ton are not adequate to establish either the usual wholesale quantities or the average prices per metric ton of cement types I and III as claimed in paragraph 7 of exhibit 2. The said 1 percent of the invoices indicates sales for January, March, April and July 1959. The remaining 99 percent of the invoices ostensibly covering the other 8 months of the year are not accounted for. Affiant's assertions are mere conclusions of law on the part of the witness, and provide no valid basis on which the court can find foreign market value, before adjustments, at the alleged weighted average prices shown in paragraphs 11 and 14 of exhibit 2. Conclusory statements of ultimate facts in an affidavit will not suffice to overcome the presumption of correctness attaching to an appraisement. *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495, and *Midland Industrial Company* v. *United States*, 57 Cust. Ct. 668, R.D. 11235.

The plaintiffs contend for certain additional allowances covering cost of maintenance of delivery equipment, and cost of operation, maintenance and depreciation of silos at Krs. 29.10 per metric ton in 1959. Plaintiffs state in their brief (page 9) "The record is silent as to how the appraiser arrived at the appraised foreign market values" then apparently assume that the appraisers omitted to take into consideration all elements entering into "other differences in circumstances of sale." This assumption is contradicted by plaintiffs' exhibit 3, Acting Commissioner King's letter to Mr. Pickrell, which states that the adjusted home market price was computed on the basis of the weighted average price, ex-factory, packed, per metric ton, from which were deducted (1) a quantity discount, (2) a cash discount, (3) administrative and selling costs, and (4) interest cost. The total of the last three items was reduced by an amount of the United States selling agent's commission. Under the principle of the presumption of correctness attaching to the appraisements, all pertinent elements were considered by the appraisers. Apart from the presumption of correctness, which alone suffices to defeat the plaintiffs, there is a failure on the part of the plaintiffs to establish by a breakdown of costs those properly allocatable to sales of cement in types I and III in bags.

The record establishes that Gullhögens manufactures and sells cement types I and III in bulk *and* in bags for home consumption (in addition to other types of cement) in Sweden, but sells only *bagged* cement types I and III for export to the United States (plaintiffs' exhibits 1 and 2, and defendant's exhibit A). Therefore, the foreign market value is keyed to the sales of cement types I and III *in bags*. Thus, plaintiffs' computations, as shown in appendix "A" of their brief, are based on the adjusted weighted average delivered price for cement *in bags* less claimed discounts and allowances. Similarly, the appraisers' determinations of foreign market value are based on their calculation of the weighted average price of bagged cement, less costs and discounts applicable thereto. It is patent that all costs incurred in connection with, or related to, sales of cement *in bulk* have no bearing on sales of cement *in bags* and must be disregarded.

Similarly, the cost of operation, maintenance and depreciation of the 8 silos in 1959 is in no way broken down for allocation to cement sales in bags or in bulk. It also appears from the record that the silos are used primarily for cement in bulk, whereas cement sold for export is in bags. Maintenance costs of silos, therefore, would have little, if any, relation to exported cement in bags.

Similarly, too, the costs for maintenance of the delivery equipment which the manufacturer, Gullhögens maintains, i.e., railroad cars,

trucks, shipping containers, equipment, are not broken down to allocate satisfactorily a known portion of the expense to bagged cement for export or in the home market. The prices and cost figures shown in exhibit A (exhibit D–2 and exhibit D–1 attached to exhibit A) relate to sales of cement by Wingårdh in bulk, and offer little if any probative aid relating to cement in bags.

In reviewing the record as a whole, I am convinced that there is not adequate and satisfactory proof of the breakdown of specific costs attributable to the imported cement in bags at bar. As stated in *C. J. Tower & Sons of Niagara, Inc.* v. *United States*, 60 Cust. Ct. 938, A.R.D. 233:

> * * * The clear trend of the decisions is to look for proofs breaking down the specific cost items making up the difference between the home market price and export price. * * *

Such proofs are not on record in the case at bar. Further, competent testimony of a cost expert is lacking in the instant case. The plaintiffs' minute computations set forth in their brief are based upon computations and statements in Mr. Pettersson's affidavits, which themselves are inadequate and incompetent, as well as conclusory. The plaintiffs urge the court to adopt such computations and statements. I feel, however, that there is insufficient evidence to sustain their position.

In my opinion, the plaintiffs have failed to overcome the presumption of correctness attaching to the appraisers' findings, both as to finding the unit purchase prices in the home market, and the foreign value in the home market.

I, therefore, find the facts to be as follows:

1. The merchandise involved consists of portland cement type I and type III, exported from Sweden during 1959.

2. The Acting Secretary of the Treasury on April 14, 1961, properly issued a statutory finding of dumping (26 F.R. 3427) pursuant to section 201(a) of the Antidumping Act of 1921, as amended.

3. The imported cement was appraised pursuant to said finding for the purpose of calculating special dumping duties in accordance with section 202(a) of the said antidumping act.

4. The said special dumping duties are in an amount equal to the difference between the appraised purchase price, as defined in section 203, and the appraised foreign market value as defined in section 205 of the said act, as amended.

5. The appraisers' determinations of purchase prices as shown in the appraisement reports herein are not in dispute; only the appraised foreign market value is challenged.

6. The prices at which such or similar cement was sold or offered for sale on or about the dates of purchase in the principal markets of Sweden, in the usual wholesale quantities and in the ordinary course of trade for home consumption, less due allowance for differences in circumstances of sale, plus applicable packing costs, are those shown in the appraisement reports, as found by the appraisers.

7. The plaintiffs' claims are not supported by substantial competent evidence.

I conclude as matters of law:

1. That the presumption of correctness attaching to the finding of values by the appraisers herein has not been overcome.

2. That the foreign market values found by the appraisers under section 402 of the Tariff Act of 1930, as amended by the Customs Simplication Act of 1956, and the foreign market values at unit purchase prices on the day of purchase found by the appraisers pursuant to the Antidumping Act of 1921, sections 205 and 203, respectively, as amended by the Customs Simplification Act of 1954, were in accordance with statutory provisions, and are affirmed.

Judgment will be entered accordingly.

(A.R.D. 268)