(C.D. 3227)

SENTORA HARDWARE DISTR.
JAMES G. WILEY CO. ET AL. } *v.* UNITED STATES

United States Customs Court, First Division

(Decided December 14, 1967)

*Glad & Tuttle* (*Robert Glenn White* of counsel) for the plaintiffs.

*Edwin L. Weisl, Jr.*, Assistant Attorney General (*Mollie Strum* and *Steven R. Sosnov*, trial attorneys), for the defendant.

Before WATSON and BECKWORTH, Judges

BECKWORTH, Judge: The merchandise involved in these cases, consolidated at the trial, consists of plastic friction tape imported from Japan and entered at the port of Los Angeles on various dates in 1962 and 1963. It was assessed with duty at 21 cents per pound and 17 per centum ad valorem under paragraph 1539(b) of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, as manufactures wholly or in chief value of any product of which any synthetic resin or resin-like substance is the chief binding agent. Various claims have been made but those relied on are that the merchandise is properly dutiable pursuant to the similitude provision of paragraph 1559(a) of said tariff act, as amended by the Customs Simplification Act of 1954, as other cotton manufactures, not specially provided for, under paragraph 923 of said tariff act, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, 90 Treas. Dec. 234, T.D. 53865, and 90 Treas. Dec. 280, T.D. 53877, or as a non-enumerated manufactured article under paragraph 1558 of said tariff act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739.

The pertinent provisions of the tariff act, as modified and as amended, are as follows:

Paragraph 1539(b), as modified by T.D. 54108:

Laminated products (whether or not provided for elsewhere in the Tariff Act of 1930 than in paragraph 1539(b) thereof) of which any synthetic resin or resin-like substance is the chief binding agent:

\*       \*       \*       \*       \*       \*       \*

In rods, tubes, blocks, strips, blanks, or other forms _____ 21 cents per lb. and 17% ad val.

Manufactures wholly or in chief value of any product described in the preceding item 1539(b), or of any other product of which any synthetic resin or resin-like substance is the chief binding agent 21 cents per lb. and 17% ad val.

Paragraph 923, as modified by T.D. 53865 and T.D. 53877:

All manufactures, wholly or in chief value of cotton, not specially provided for:

\*       \*       \*       \*       \*       \*       \*

Other (\* \* \*) _____ 20% ad val.

Paragraph 1559(a), as amended:

Each and every imported article, not enumerated in this Act, which is similar in the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty as the enumerated article which it most resembles in the particular before mentioned; and if any nonenumerated article equally resembles in that particular two or more enumerated articles on which different rates of duty are chargeable, it shall be subject to the rate of duty applicable to that one of such two or more articles which it most resembles in respect of the materials of which it is composed.

Paragraph 1558, as modified by T.D. 52739:

Articles manufactured, in whole or in part, not specially provided for (\* \* \*) _____ 10% ad val.

A sample, received in evidence as exhibit 1, consists of a roll of the imported plastic tape. It represents item number 20 and is 66 feet. in length, differing from item number 10 (which is also in issue) only in that the latter is 33 feet in length. It was stipulated at the trial that it was not a laminated product.

Mr. Sabu Konishi, president of Sentora Hardware Distributors, Inc., a company importing Japanese hardware and appliances, testified

that all the plastic tape in issue is black in color and that his company never imported this tape in various colors. He said that it is sold as friction tape and that more than 90 percent is sold for use in insulating electric wires and that it is sometimes used on chairs or tools to give a grip on them and to prevent the hand from slipping.

Mr. Konishi also testified:

Q. Are you familiar with any other friction tape made of other material?—A. Yes, we import friction tape, it is different components, basic cotton or rayon and rubberized. It is entirely different merchandise, very similar use, you know, but different paragraph.

Mr. Paul E. Matheny, a professional chemist employed by Smith-Emery Company, an independent physical testing laboratory, testified that he is a graduate chemist and belongs to the American Chemical Society and Institute of Food Technologists. He had been employed at Smith-Emery for about 7½ years and before that was chief chemist for the American Crystal Sugar Company in Oxnard, California. In his position at Smith-Emery, he is required to perform and supervise laboratory tests on plastics and is experienced in his professional capacity in the analysis of plastics.

Mr. Matheny testified that he had received a sample of friction tape from Sentora Hardware Distributors, Inc., plaintiff's exhibit 1. He had had an ash test performed on the sample under his supervision. He described the test as follows:

A definite amount of material is placed in a constant weight, ignited in a crucible, or other type of crucible, a known amount of the material being tested is placed in that, and it is placed over a burner and allowed to be heated at a temperature of approximately 600 or better degrees Centigrade until all of the material has been consumed, with the exception of the ash residue.

The report of the test performed on exhibit 1 was received in evidence as exhibit 2. It states that an ash residue of 1.3 percent was found; gives the major constituents as antimony and lead; lists the other constituents found and the percentages thereof, and concludes:

We would not consider the ash content as shown above, to be indicative of a mineral filler bound together with a binding agent.

The witness explained that a filler is matter that is in material only to occupy volume or to make the material stretch further. A number of materials are used as fillers; generally they are inert and inorganic. The witness mentioned several organic substitutes which might be used as fillers, such as flour, wood or sugar, but he expressed doubt that organic fillers would ordinarily be used. He explained that ash tests actually determine the amount of material that is not consumed by burning, and that since such materials are inorganic (the kind

usually used as fillers), the tests help to determine whether fillers are present.

In the instant case, the witness did not consider the ash residue to be indicative of a filler because it was around 1 percent. He said that an ash residue of 3 to 5 percent or over would indicate a filler, but that under that it would not. He thought that the various constituents found by spectrographic examination and specified in the report, exhibit 2, were present accidentally as contaminants or might have been materials used for pigmentation. He stated that his opinion that an ash residue of over 3 percent constitutes a filler was based upon his experience in conducting other tests and the general consensus of his coworkers.

Mr. Denzel Curtis, called as a witness for the defendant, testified that he was a chemist for the United States Customs Service and had been so employed for 11 years. He had received a bachelor of science degree from the University of California in 1932 and a master of science degree from Cornell University in 1936. He had been a chemistry teacher and a chemist for industrial organizations and had done research work for universities.

Mr. Curtis testified that he was familiar with tests performed upon merchandise, such as the type in this case, to ascertain whether synthetic resin acts as the chief binding agent. He had assisted in the performance of a test of a sample of the merchandise covered by entry 47672, protest 64/7236(A), but he did not know whether the sample tested was exhibit 1. He remembered the test because there was a controversy or question about it, and it was discussed day after day so that it was rivited in his mind. He said that he took the tape, cut off a piece and weighed it and put it in a crucible and ashed it, and that after ashing it he took the crucible and weighed it. He said that both Mr. Albert Schneider and Mr. R. G. Nicholson, chief chemist, supervised his activities. He found the ash residue to be 4 percent. Based on that, it was his opinion that the synthetic resin in the tape acted as the chief binding agent. He also performed a similar test on merchandise covered by protest 63/11163. That test resulted in a higher ash residue and he again concluded that the plastic portion of the tape was acting as the chief binding agent. He said that in both cases there was a sufficient amount of ash for the synthetic resin to be acting as the chief binding agent.

He explained his opinion on the ground that pure polyvinyl chloride results in no ash when consumed because its constituents are carbon, hydrogen, and chlorine, all of which are volatile. It was, therefore, his opinion that any ash would constitute a sufficient amount for the synthetic resin to be the binding agent. He also testified that pure poly-

vinyl chloride is clear and has no color, and that since exhibit 1 was black, something must have been added to produce the pigmentation. He stated that several items, such as carbon or lead, would produce color. However, he did not look for lead in the ash but did look for calcium because calcium is a cheap filler. He was acting on the presumption that there was a filler in the material. He said that not every article of polyvinyl chloride which is not pure has a resin as a binding agent as small amounts of ash can be present as the result of contamination in a catalyst or from pigments that have been added.

He said that he had found calcium carbonate in the ash in the instant case and that it was not carbon, although it contained carbon. He also stated that, if calcium carbonate is incinerated at extremely high temperatures, the carbon can be turned into a gas leaving nothing but calcined calcium.

Mr. Curtis stated that it has been the practice of the Los Angeles customs laboratory since 1960, when it started making analyses for fillers, to consider the presence of any ash as indicative of a filler.

Mr. Matheny was recalled to the stand and testified that in an ash test, calcium carbonate would not be present since the carbonate would have decomposed into oxide and carbon dioxide would have been formed.

Plaintiffs claim that the synthetic resin in the plastic friction tape herein does not bind anything but rather is a component of the article itself, and that the classification made by the collector was erroneous. They claim that there was nothing present in the synthetic resin as a filler which would be bound by the resin.

No evidence was presented as to the method of manufacture of the plastic tape which would show what materials, if any, were added to the synthetic resin or for what purpose. The resolution of the question of whether or not there was a filler in this material to be bound by the synthetic resin has been left to the chemical analyses.

In the instant case, tests were performed by two qualified chemists on the imported material, although not necessarily on the same roll of tape. These chemists have obtained a different ash residue—one finding it to be 1.3 percent and the other 4 percent. This may have been due to a difference in the samples tested or to a difference in the method of testing. There is nothing in the record to indicate whether one sample was more representative of the imported merchandise than another, nor is there anything to show to what extent the methods differed, or whether one was more accurate than another. The Government chemist, Mr. Curtis, found calcium carbonate in the ash, and exhibit 2, the report of the test made for plaintiffs, notes the presence of calcium. Mr. Curtis said that, if calcium carbonate is incinerated at extremely

high temperatures, the carbon is turned to gas leaving only calcium. Mr. Matheny testified that this would happen in a true ash test and that he had heated the material to 600 degrees Centigrade. Therefore, it may be that the tests applied were different. The record does not establish whether, for the purpose intended, one method was more accurate than another.

The decided cases do not indicate that any particular percentage of ash residue, unexplained, establishes the presence of filler material but do show that material added for other purposes may take the merchandise out of classification as wholly or in chief value of a product of which a synthetic resin is the chief binding agent. *Prepac, Inc.* v. *United States*, 43 Cust. Ct. 97, C.D. 2111; *J. M. Rodgers Co., Inc.* v. *United States*, 59 Cust. Ct. 91, C.D. 3084; *Wm. A. Hausman Co., Inc.* v. *United States*, 57 Cust. Ct. 391, C.D. 2828.

In the *Prepac* case, there was evidence that, where the ash content was below 8 percent, it was the administrative practice not to classify the merchandise under paragraph 1539(b) but, *contra*, where the ash content was over 8 percent. The ash content of the samples in that case varied from 2.7 to 11.2 percent. Plaintiff offered the testimony of a witness qualified as a chemical engineer with special competence in the fields of plastics and dyestuffs. He testified that "most" of the ash was titanium dioxide and that the rest may have resulted from the accidental inclusion of inorganic substances during manufacture. The court said that in any event it appeared that any ash which was not accounted for by titanium dioxide was so small as to be below the Government's limit of 8 percent, and so, consequently, not accountable as a filler. Since the testimony was not contradicted or shaken on cross-examination, the court accepted the chemist's opinion as establishing that the ash content represented a pigment and not filler materials.

In the *Hausman* case, the Government chemist testified that he had treated calcium carbonate as a filler except when present in very small amounts—less than 1 or 2 percent. In those amounts, he said it is regarded as an impurity. He also said that the line set up by the Bureau of Customs was 2 percent. In that case, the percentage of ash residue was actually 16.5 percent, and plaintiff did not establish either that all of the calcium carbonate found was a "vesication-adjuster" or that none of it was a filler. The court concluded, "not having facts in the case now before us to show that calcium carbonate was not a filler, the court cannot adjudicate contrary to the official determination and it must stand."

In the *J. M. Rodgers Company* case, the report of the customs laboratory showed that the merchandise consisted of a synthetic resin containing no organic filler and 2.7 percent ash (chiefly calcium car-

bonate filler). The laboratory opinion was that the resin was serving as chief binding agent. However, an expert witness in the art of manufacturing synthetic resins testified that the calcium carbonate was not a filler but served as a stabilizer and neutralizer. In view of this testimony, the Government conceded that the merchandise was erroneously classified by the collector under paragraph 1539(b).

In the instant case, there is evidence that pure polyvinyl chloride is clear and that the sample is black in color. It is evident, therefore, that something has been added for pigmentation. Defendant's chemist said that lead might cause pigmentation, and exhibit 2 and the testimony of plaintiffs' witness indicate that lead was one of the major constituents of the ash residue. Thus it is clear that some of the ash was due to material added for pigmentation but there is no evidence to show whether all of it was. Paraphrasing language in the *Hausman* case, if X is the amount added for pigmentation, the total amount found less X might still be a filler. The probabilities are, in view of the small percentage of ash residue found even by the Government chemist, that it was not, but this has not been established.

However, even if the proof on this point were conclusive, plaintiffs would still have the burden of establishing the correct classification of the merchandise. *United States (Index Industrial Corp., Party in Interest)* v. *National Starch Products, Inc.*, 50 CCPA 1, C.A.D. 809; *Schlumberger Well Surveying Corp.* v. *United States*, 54 CCPA 37, C.A.D. 901.

In the instant case, plaintiffs claim that the merchandise is dutiable either by similitude to manufactures of cotton not specially provided for under paragraph 923, as modified, or as a nonenumerated manufactured article under paragraph 1558, as modified. The latter provision cannot be reached unless it is first established that the merchandise is not classifiable directly or by similitude under another paragraph of the tariff act. *Isler & Guye* v. *United States*, 11 Ct. Cust. Appls. 340, T.D. 39146.

The only evidence tending to establish similitude to cotton friction tape is Mr. Konishi's testimony that his firm imports friction tape of different components "basic cotton or rayon and rubberized." Furthermore, a recent case and various Bureau of Customs rulings indicate that there are various kinds of plastic tape and friction tape in existence. In *Devon Tape Corp.* v. *United States*, 57 Cust. Ct. 507, C.D. 2856, for instance, thermoplastic tape used for wrapping and insulating electrical wire splices and connections was held similar to rubber tape used for the same purpose. In a ruling of the Bureau of Customs, called to our attention by plaintiffs, it was held that a certain type of vinyl friction tape was classifiable by similitude to cotton friction

tape under paragraph 923. 95 Treas. Dec. 270, 273, T.D. 55133 (15). This ruling applied to vinyl tape consisting of a strip of opaque black polyvinyl chloride containing no filler material and less than 2 percent carbon, manufactured by spreading adhesive on one face of polyvinyl chloride sheets and then slicing the sheets into strips.

There are other rulings of the Bureau of Customs involving rayon, cotton, plastic, and rubber tapes of different kinds, classifying them under various paragraphs of the tariff act: 94 Treas. Dec. 329, 334, T.D. 54885 (24) ; 95 Treas. Dec. 325, 327, 328, T.D. 55167 (13, 14, 15) ; 95 Treas. Dec. 492, 496, T.D. 55265 (21) ; 96 Treas. Dec. 343, 347, T.D. 55482 (22) ; and 96 Treas. Dec. 428, 431, T.D. 55533 (11).

Since there are friction tapes made of various materials, the imported merchandise must be classified by similitude to the one it most resembles in use, or if it equally resembles more than one, to the one it most resembles in material. *S. S. Kresge Co. et al.* v. *United States*, 46 CCPA 100, C.A.D. 707. There is nothing in the record before us to establish which tape the merchandise here most resembles in either use or material. No facts have been presented to show that this tape is like that covered by the Bureau of Customs ruling relied on by plaintiffs (which, of course, is not binding on the court) and not like that involved in the *Devon* case or any of the others involved in other Bureau of Customs rulings.

Plaintiffs have neither established that the imported merchandise is classifiable by similitude to manufactures of cotton under paragraph 923, as modified, nor that the merchandise is not classifiable by similitude under some other paragraph. Consequently, it cannot be held that the merchandise is properly dutiable under paragraph 1558, as modified, as nonenumerated manufactured articles. *J. E. Bernard & Co., Inc.* v. *United States*, 53 CCPA 116, C.A.D. 886.

In view of the record presented, the protests are overruled and judgment will be entered for the defendant.