(C.D. 4413)

DAVIS PRODUCTS, INCORPORATED, ET AL. *v.* UNITED STATES

United States Customs Court, First Division

(Decided March 12, 1973)

*Stein & Shostak* (*S. Richard Shostak* and *Leonard Fertman* of counsel) for the plaintiffs.

*Harlington Wood, Jr.*, Assistant Attorney General (*Patrick D. Gill*, trial attorney), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: These two protests which were consolidated for trial concern the dutiable status of vinyl air mattresses that were imported from Japan via the port of Los Angeles, California, in 1962. The importations were found on analysis to contain calcium carbonate and were classified by the government under paragraph 1539(b) of the Tariff Act of 1930, as modified by T.D. 54108, as manufactures wholly or in chief value of any product of which any synthetic resin or resin-like substance is the chief binding agent and

were assessed with a duty of 21 cents per pound plus 17 percent ad valorem.[1]

Plaintiffs claim that this classification is erroneous, alleging that the polyvinyl resin or resin-like substance in the imported mattresses does not act as a binding agent on the stated ground that the small percentage of calcium carbonate included therein does not act as a filler and that, accordingly, the imports do not contain two components bound together. Hence, plaintiffs insist that the imported air mattresses are properly classifiable under paragraph 1537(b) of the Tariff Act of 1930, as modified by T.D. 53865, by similitude to manufactures of india rubber, not specially provided for, and thus dutiable at the rate of 12½ percent ad valorem.[2]

At the trial, defendant stipulated with plaintiffs that the inflatable air mattresses covered by protest 64/1001 had been improperly classified by the government under paragraph 1539(b) and were, as claimed by plaintiffs, properly classifiable under paragraph 1537(b) by similitude. It is to be added that a sample of the air mattresses covered by that protest was found on analysis to contain less than 2.4 percent calcium carbonate.

Remaining then for consideration is the propriety of the government's classification under paragraph 1539(b) of the inflatable air mattresses covered by protest 63/11309 which were found on analysis to contain 8.1 percent calcium carbonate. Overall, the issue with respect to this protest is whether the synthetic resin therein acts as a binding agent. Resolution of this issue depends in turn on whether or not the 8.1 percent calcium carbonate was present as a filler. If the calcium carbonate was present as a filler, the imports would then consist of a so-called "two-component" material that was bound by the synthetic resin and would therefore come within the purview of paragraph 1539(b). On the other hand, if the calcium carbonate was not present as a filler, there would be an absence of two substances bound together,

---

[1] Paragraph 1539(b), as thus modified, reads:

Manufacturers wholly or in chief value of * * * any other product of which any synthetic resin or resin-like substance is the chief binding agent_____ 21¢ per lb. and 17% ad val.

[2] Paragraph 1537(b), as thus modified, provides as follows:

Manufactures of india rubber or gutta-percha, or of which these substances or either of them is the component material of chief value, not specially provided for * * *

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

Other _____ 12½% ad val.

The similitude provision—paragraph 1559(a) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1954—reads in part as follows:

(a) Each and every imported article, not enumerated in this Act, which is similar in the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty as the enumerated article which it most resembles in the particular before mentioned; * * *.

in which case the synthetic resin would not be acting as a "binding agent" and paragraph 1539(b) would be inapplicable. Thus, the nub of the controversy is whether or not the 8.1 percent calcium carbonate was present in the importations as a filler.

At the trial, one witness testified on behalf of the plaintiffs and one on behalf of the defendant. Plaintiffs' witness was Sidney L. Friedlander, an electronic engineer, who, at the time of trial, was employed by a medical electronic equipment manufacturer. The witness holds a bachelor of science degree in engineering from UCLA, and in the course of his undergraduate study took one year of general chemistry and one semester of qualitative and quantitative analysis.[3] After a brief period in engineering posts with General Electric and Hughes Aircraft, he joined plaintiff Davis Products (hereinafter referred to as "Davis") as chief engineer and then progressed through all phases of production and production management and eventually became executive vice-president.

Prior to joining Davis, the witness had no special training or knowledge with respect to plastic air mattresses; what knowledge he had, he acquired as Davis sought to improve the basic design of such mattresses. Starting about 1954, he spent many weeks with Bolta Products of Lawrence, Massachusetts, a materials supplier for Davis, "working with them on formulations" of material for mattresses and participating in the testing of the material for sunlight durability, tensile strength, heat sealability, and freedom from pinholes. When Bolta was acquired by General Tire and Rubber Company, Friedlander testified that over a period of two or three years he "worked very closely" with the chief chemist of General Tire's plant in Jeannette, Pennsylvania. It was at this time that mass production of certain co-polymer resins of polyvinyl chloride was beginning to take place which was making it possible to produce vinyl plastic merchandise that could not be manufactured before. For example, he stated, by adding such ingredients as titanium dioxide or calcium carbonate, the sunlight durability of vinyl (i.e., resistance to deterioration from sunlight) was enhanced and the vinyl better able to withstand extremes of temperature.

In 1961, Davis entered into an agreement with a Japanese concern for the manufacture of inflatable air mattresses in accordance with specifications furnished by Davis. These specifications covered the tensile strength; the maximum permissible pinholes; the color; the sunlight durability; the heat sealability; and the "cold crack" tem-

---

[3] The judge presiding at the trial stated that the witness was not qualified as an expert chemist.

perature.[4] While Davis did not give the manufacturer any instructions with respect to calcium carbonate content, the specifications themselves dictated the percentage of calcium carbonate that would go into the material.

Calcium carbonate, the witness indicated, is a white opaque powder [5] which is basically lime and is used to: (1) stabilize vinyl for cold weather; (2) extend vinyl sunlight durability; (3) give vinyl a normal feel; (4) increase the tensile strength of vinyl; and (5) prevent the vinyl material from sticking to the calenders, thus enabling the calenders to run at higher speeds.[6]

The witness further testified that freedom from pinholes—which are formed by particles when the vinyl is stretched—is another important consideration in the manufacture of inflatable air mattresses. In order to prevent pinholes, precipated calcium carbonate of a smaller particle size than normally ground calcium carbonate is used which does not form clumps of itself or pop out of the inflatable mattress when it is blown up thus causing an air hole. Also to prevent pinholes, the witness stated that all the ingredients used in making the imported mattresses were of the highest grade, including the "pigmentation, so-called 'fillers' * * * which are put in for the ultraviolet or other characteristics in the material * * *."

According to Friedlander, clear vinyl has a sunlight durability of between 400 and 500 hours which is not enough for outdoor products such as inflatable air mattresses that are used for camping, water activities and other outdoor purposes. Such mattresses, he said, must be able to endure at least one year's outdoor usage, and under Davis' specifications required a sunlight durability of 1200 to 1300 hours. In addition, they had to have a very low temperature formulation so that they could be used for camping even in cold weather. Calcium carbonate, he testified, was used not only to meet these requirements but also to increase the tensile strength of the vinyl material, provide the desired feel, and prevent the material from sticking to the calenders. Titanium dioxide, he indicated, while twice as effective as calcium carbonate in enhancing sunlight durability and providing low temperature formulations, is far more costly and unnecessary to use since the sunlight durability requirement of 1200 to 1300 hours

[4] "Cold crack", the witness indicated, is the resistance to stress created by folding or dropping or impacting a vinyl product at the point of its smallest radius or curvature.

[5] Titanium dioxide is also a white opaque powder that, according to the witness, is used, among other things, to enhance sunlight durability—in which respect it has twice the effect of calcium carbonate.

[6] Calenders are huge machines which squeeze the heated vinyl compound between counter-rotating steel rollers, thus forming a thin sheet from which the inflatable air mattresses are made.

and the low temperature formulation could readily be met by calcium carbonate.

With respect to the manufacture of the imported air mattresses, the witness testified that when the vinyl came off the calendar, it was rolled up and transferred to the fabricator who cut the material to the desired length, punched a hole in it for the valve, put a valve into it, and then heat-sealed it to fabricate it into an air mattress.[7]

In summing up, the witness indicated that calcium carbonate was used in the imported air mattresses to improve their sunlight durability, to provide appropriate color, to give them appropriate hardness and feel, to increase their tensile strength, and to facilitate the calendering operation. Finally, he testified that the term "filler" referred to "any material other than the resin and plasticizer, and the basic stabilizer, which would be cadmium or chromium stabilizers." Included as "fillers", he said, are "[p]igments: materials added to helping [sic] calendering; the materials added to improve sunlight stability—all of the things that you put into a basic vinyl compound to give it the properties that you want it to have."

Defendant's witness was Albert H. Schneider, chief chemist of the U.S. Customs Laboratory in San Pedro, California. It was stipulated that Schneider, who served with the Customs Laboratory for 21 years, was a qualified chemist. However, he had no practical experience in businesses involved in making vinyl plastic sheets or vinyl inflatable air mattresses. He testified that he personally performed the Customs Laboratory's test of a sample from a FM–600 air mattress—the mattress here in issue—and that the test showed that the plastic part of the sample was composed of polyvinyl chloride resin, and that the mineral matter (ash) therein amounted to 9.2 percent of which 8.1 percent was calcium carbonate.[8] The report of the test contained the further notation that "[i]n our opinion the mineral matter present in the plastic part of the sample marked 'FM 600/Cs26' is present as

---

[7] Friedlander further testified that protest 64/1001, which was conceded by the government, involved style number FM–690 and consisted of an inflatable air mattress with a pump inserted therein. The witness added that the air mattresses in issue covered by protest 63/11309 involved style number FM–600 which did not have a pump included. According to the witness, the FM–690 and FM–600 style numbers were made from the same material, fabricated in the same manner and had the same use; the only difference between them, he said, is that the FM–690 had a pump inserted in it.

[8] This same laboratory test showed that a sample from the FM–690 air mattress—which mattress is covered by the stipulation in protest 64/1001—contained 2.4 percent mineral matter (ash). A second and later laboratory test of another sample made by the witness showed that the mineral matter (ash) amounted to 4.2 percent of which 2.5 percent was calcium carbonate. Written in red handwriting on this second report is the notation "Red—FM 600". The witness testified that he himself did not put that red-ink notation on the laboratory report and did not know who did. No further evidence was adduced on this particular matter. In light of this circumstance and the finding in the previous laboratory report that the FM–600 air mattress contained 8.1 percent calcium carbonate, the red-ink notation in the second report—made as it was by someone unknown—cannot be afforded probative value.

a filler, and it is therefore our opinion that the synthetic resin in this part is acting as the chief binding agent."

The witness Schneider testified that in performing the laboratory tests a sample of the plastic was removed from the air mattress and separated from the cloth. The sample was weighed and then burned in an electric furnace at 500° centigrade. At that temperature, the organic matter was burned off and the residue called ash was weighed. The calcium content of the residue was measured by the standard method of titration with permanganate. When the end point was reached, the solution changed color and the amount of calcium carbonate was then calculated. The ash was also tested for calcium carbonate by a qualitative test.

The witness explained that the statements in his laboratory report that the sample from the FM–600 mattress contained mineral matter and that the synthetic resin was acting as the chief binding agent "meant that the plastic contained a filler, and that the synthetic resin, which is the polyvinyl chloride, is acting as a binding agent to hold this product together." He stated that he has found polyvinyl chloride plastics with calcium carbonate contents ranging from zero to 25 percent, although the most common range was between 6 and 12 percent.

The witness testified that it was his opinion as a chemist that the calcium carbonate was present in the merchandise in issue as a filler. In his view, a filler is an extender of the product and can also have incidental properties. Thus, most fillers would have a color and would therefore impart pigment properties. The filler could also prevent the calendars from sticking. Further, the filler could be opaque and hence prevent the sunlight from going through. These properties, the witness emphasized, are incidental properties but the primary purpose of the calcium carbonate is to act as a filler. He added that he would not consider titanium dioxide to be a filler since—in contrast to calcium carbonate—its primary purpose is for pigmentation rather than as a filler.[9]

A binding agent, Schneider testified, is a substance which holds the product together, and therefore in order to have a binder, there must be at least two components in the product. For example, he stated, in the imported vinyl air mattresses the polyvinyl resin holds the polyvinyl chloride plastic and the filler together and makes one sheet of the material.

The witness explained that the Customs Bureau has issued guidelines to be applied in determining whether certain substances contain filler. Thus a Bureau ruling dated February 7, 1957 (C.I.E. 331/57) [10]

---

[9] In this connection, a Bureau of Customs letter dated July 20, 1962 (C.I.E. 743/62), provided that titanium dioxide, regardless of quantities, was not a filler.

[10] This ruling is quoted in the *Tariff Classification Study (1960), Schedule 7,* Part 12, pp. 441–42.

states that—

"* * * accelerators, pigments, stabilizers, anti-blocking agents, opacifiers, and plasticizers, when added to a plastic primarily for the purposes indicated by their descriptions, are not to be considered as fillers or materials bound by a synthetic resin or resin-like substance for the purposes of paragraph 1539(b). They shall be treated as integral constituents of the resin or resin-like substance. Note C. I. E. 464/56.

So-called cheapeners, fillers, or other material added to synthetic resins primarily for the purpose of extending the plastic or for the purpose of making what might be termed as a "two component" material are considered as being bound by the synthetic resin or resin-like substance within the meaning of paragraph 1539(b).

In view of the foregoing, recognizing the fact that from a practical standpoint it is not feasible in all cases for the laboratories to make precise quantitative and qualitative analyses of an imported plastic item, recognizing that many products contain small amounts of impurities, and recognizing that the law takes no account of trifles, it is the Bureau's opinion that when it is found or it is reasonably apparent that a synthetic resin contains nothing other than those substances described in paragraph 2 of this letter [that is, accelerators, pigments, etc.], the synthetic resin should not be treated as a binding agent for purposes of paragraph 1539 (b). For purposes of this ruling, if a synthetic resin contains 8 per centum or less of ash material which cannot readily be established as a filler, cheapener, or other material commonly bound by a resin or resin-like substance, the synthetic resin may be assumed not to be acting as a binding agent."

Schneider testified that this ruling "as well as many other things" was taken into account by him in concluding that the imported merchandise was classifiable under paragraph 1539(b), but that the standard of 8 percent in that ruling was not considered. He testified further that in his oponion he considered calcium carbonate to be a filler even in merchandise where his test showed the presence of a mineral matter of 4.2 percent of which 2.5 percent was calcium carbonate (see note 8 *supra*); likewise, he would consider the calcium carbonate in the stipulated protest—64/1001—to be a filler. He concurred in the conclusion that a calcium carbonate content of 2.5 percent was not a filler only because of a court decision,[11] and not because of his opinion as a chemist. In this connection, he was of the view that the court erred in holding that a 2.5 percent calcium carbonate content was not present as a filler since in his opinion as a chemist all but a negligible amount of calcium carbonate should be considered as a filler. Thus, he stated that if he found calcium carbonate present in an insignifi-

---

[11] At no point in the record is there any identification of the court decision thus referred to.

cant amount, he would not consider it a filler, but if it were present in a significant amount, he would consider it a filler.

The witness testified that his opinion in this respect was based in part upon technical literature, among which is the following statement in *Modern Plastics Encyclopedia*, Vol. 45: No. 14A (1968), p. 579:

> * * * Calcium carbonate is the filler most widely used in PVC [polyvinyl chloride] compounds. * * * calcium carbonates are used in PVC compounds for specific performance characteristics.

Finally, the witness testified that there was no doubt in his mind that when calcium carbonate to the extent of 8.1 percent is contained in a plastic, it is present as a filler.

With these considerations in mind, plaintiffs argue that the record establishes that the 8.1 percent calcium carbonate which was found in the mattresses in issue was added by the manufacturer to perform at least five specific functions, i.e., improve their sunlight durability, provide appropriate color, give them appropriate hardness and feel, increase their tensile strength, and facilitate the calendering operation. These functions, plaintiffs add, make the calcium carbonate something other than a filler. And, plaintiffs continue, since there is no filler in the imported vinyl mattresses, there are no two components to be bound together by the synthetic resin, and hence the government's classification under paragraph 1539(b)—requiring a binding agent to be present—is erroneous. Finally, plaintiffs insist that by establishing the specific functions of the calcium carbonate, they have brought the merchandise within the controlling effect of two decisions that material added to vinyl compounds for specific purposes other than as a filler may remove such merchandise from classification under paragraph 1539(b) as wholly or in chief value of a product of which a synthetic resin is a chief binding agent. The cases thus relied upon are *Prepac, Inc.* v. *United States*, 43 Cust. Ct. 97, C.D. 2111 (1959), and *J. M. Rodgers Co., Inc.* v. *United States*, 59 Cust. Ct. 91, C.D. 3084 (1967), *modified on rehearing*, 60 Cust. Ct. 42, C.D. 3251 (1968).

*Prepac* involved polyvinyl chloride-type plastic sheeting that was classified under paragraph 1539(b), as in the present case. There the court held that uncontradicted, competent evidence that imported plastic sheeting was composed of a synthetic resin and *titanium dioxide*, and that the latter was present in the sheeting as a pigment to color the material and not as a filler material bound by the resin, established that the imported sheeting was not a manufacture wholly or in chief value of a product of which a synthetic resin is the chief binding agent.

It is to be added that in *Prepac*, the government conceded that if the ash were present as an inherent part of the resin to give it its character, or to stabilize, opacify, or pigment (color) the resin, paragraph 1539(b) would not be applicable. In this circumstance, plaintiffs had the burden of showing that the titanium dioxide was present in the compound as a coloring agent and not as a filler material. To meet this burden, plaintiffs called a qualified chemical engineer with special competence in the fields of plastics and dyestuffs who testified without contradiction that titanium dioxide costs 50 to 100 times as much as many other inorganic materials that could be used as a filler; that titanium dioxide is used as a pigment and never as a filler; and that it was so used in the imported sheetings. The court accepted this uncontradicted expert testimony and sustained the claim.

From what has been said, it is apparent that *Prepac* is entirely distinguishable from the present controversy. In the first place we are concerned here with the presence of calcium carbonate and not titanium dioxide. Second, the decision in *Prepac* was based on evidence that the titanium dioxide was present as a pigment and not as a filler, coupled with the government's concession that if the titanium dioxide were present as an inherent part of the resin to pigment it, paragraph 1539 (b) would not be applicable. On the other hand, in the present case, the government has not conceded that if specific functions, such as pigmentation, were performed by the calcium carbonate in the compound, it would be precluded from being filler and hence from being bound to the resin. To the contrary, the government in the present case produced an expert chemist who testified without contradiction that the calcium carbonate is present in the vinyl herein as a filler, and that by definition "fillers" are expected to produce certain effects in the resins to which they are added.

In *J. M. Rodgers, supra*, 59 Cust. Ct. 91—the other case relied upon by plaintiffs—black vinyl raincoats made of a composition of synthetic resin (polyvinyl chloride) and approximately 2.7 percent calcium carbonate were held to be properly classifiable by similitude to india rubber raincoats under paragraph 1537(b) rather than classifiable under paragraph 1539(b) as manufactures wholly or in chief value of a product of which synthetic resin or resin-like substance was the chief binding agent. In that case, an expert in the art of calendering, manufacturing and using synthetic resins testified that the calcium carbonate used in the raincoat was essentially a stabilizer which (1) neutralized the acid generated by the hot steaming plastic and thus prevented the plastic from breaking down; (2) cleaned and neutralized the steel rollers to permit speedier calendering; and (3) acted as a neutralizer to the finished plastic which would otherwise become brittle from acid

it would slowly give off. As a result of this testimony—limited solely to the raincoats there imported—the government conceded (59 Cust. Ct. at 94) :

> * * * "* * * that the classification of the imported merchandise, i.e., black vinyl raincoats made from polyvinyl chloride sheeting which shows an approximate ash content of 2.7 percent by weight, eliciting the presence of calcium carbonate in approximately the same amount, under paragraph 1539(b), as modified, *supra*, is erroneous. This concession is made in view of the testimony to the effect that calcium carbonate, when introduced into a polyvinyl chloride compound in quantities as small as is in the merchandise at bar, does not serve the function of a filler, but as a stabilizer of merchandise." * * *

Based on the testimony and the government's concession in *Rodgers*, the court concluded that the government's classification under paragraph 1539(b) was erroneous.

By contrast, in the present case the government is contesting plaintiffs' allegation that the calcium carbonate is not present in the imported compounds as filler. Thus the issue here is whether the calcium carbonate present in the amount of 8.1 percent is filler. And on this aspect, it is again to be observed that *Prepac*, dealing with titanium dioxide, and *Rodgers*, concerned with calcium carbonate in the quantity of 2.7 percent, are no precedential value to the specific issue here.

It is also worthy of note that Bureau ruling C.I.E. 331/57 (previously quoted) refers to an administrative practice which provides in effect that "if a synthetic resin contains 8 per centum or less of ash material which cannot readily be established as a filler, cheapener, or other material commonly bound by a resin or resin-like substance, the synthetic resin may be assumed not to be acting as a binding agent." [12]

It must be emphasized in this connection that our only concern is whether or not the 9.2 percent ash material in the imported mattresses, of which 8.1 percent is calcium carbonate, is present as a filler. And on this score, we must conclude that plaintiffs have failed

---

[12] With respect to this ruling, the *Tariff Classification Study* (*1960*), *Schedule 7, Part 12*, contains the following observations (p. 442) :

From the foregoing [Bureau ruling] it is clear that the Bureau of Customs, for the purposes of orderly administration of paragraph 1539(b), has had to evolve arbitrary criteria for determining whether or not an article is wholly or in chief value of a product "of which any synthetic resin or resin-like substance is the chief binding agent". This is particularly true with respect to the distinction concerning ash content. For an article to be classified under paragraph 1539(b) if it contains 9 percent of ash material but not to be thereunder if it contains 7 percent of ash material, is patently anomalous. There is the same inherent anomaly with respect to a determination that a particular percentage of a pigment is found necessary in a particular article for the purpose of giving color, whereas an excess above that percentage will be considered a filler. Clearly, the present paragraph 1539(b) necessarily leads to illogical and anomalous results.

to overcome the presumption that the 8.1 percent calcium carbonate contained in the FM-600 mattresses was present as a filler. Indeed, the evidence supports a positive finding that the calcium carbonate was present as a filler. Thus, Mr. Friedlander—plaintiffs' own witness—indicated that the calcium carbonate was present in the imported merchandise as filler when he testified that since labor costs were so low only the highest grade material was used in the manufacture of the imported product "that includes your pigmentation, so-called *'fillers'* if you want to put it that way, which are put in for the ultraviolet or other characteristics in the material * * *." (R. 30) [Emphasis added.] Further, he defined "filler" as "any ingredient * * * in * * * vinyl formulations * * * other than the resin and plasticizer, and the basic stabilizer, which would be cadmium or chromium stabilizers." Included as fillers under the witness' definition would be "[p]igments: materials added to helping [sic] calendering; the materials added to improve sunlight stability—all of the things that you put into a basic vinyl compound to give it the properties that you want it to have." (R. 75) This testimony is in harmony with the definition of defendant's witness of "filler" as an extender of a product which has incidental properties such as pigmentation, adding color to the product, or opaqueness which give the product light durability. In short, in the opinion of defendant's expert witness, the calcium carbonate present in the importation was added to the vinyl as a filler. And what is more, plaintiffs have offered no evidence to rebut this opinion.

Also, the recognized authorities in the field of plastics indicate that "fillers" are used for a multitude of reasons, only one of which is to reduce cost. Thus, in Simonds and Church *The Encyclopedia of Basic Materials for Plastics* (Reinhold Publishing Corp., New York, 1967), the following pertinent material appears regarding "fillers" (p. 213):

### Fillers, Properties and Uses

Fillers are defined as comminuted solid materials which occupy a volumetric proportion of a plastics composition as a discontinuous phase. Extenders serve a distinctly different purpose, being monomeric or polymeric diluents for the primary polymer and a part of the continuous phase of the composition. The terms "filler" and "extender" are, to a certain degree, synonymous in the popularly held connotation as materials which reduce the costs and properties of the polymer forming the basis of the composition. This, however, is not necessarily the case.

*Many fillers provide beneficial effects beside reducing costs. The general functions of fillers will be described below, emphasizing the reasons for their use and their particular limitation.* * * *

\*　　\*　　\*　　\*　　\*　　\*　　\*

(pp. 213–14)

### Functions of Fillers

Some fillers are used primarily for reducing the cost of the plastic. Here the fillers replace a volume of the more expensive resin in the plastic composition.

Physical properties of filled plastics are generally affected by the type and amount of filler they contain. Tensile strengths, impact resistance and elongation are reduced in proportion to the filler concentration. Modulus (stiffness) is usually increased by fillers since they function as rigid additives and reduce the mobility of the polymer when strained. Flexural strength effects depend upon the nature of the polymer; thermoplastics are generally embrittled and their flexurals strengths decline, whereas thermosets, which are rigid systems, are generally improved to a certain degree depending upon the filler concentration. Particular types of very fine particle-size fillers frequently exert a physical strength improvement at very low concentrations, but these effects are specific for certain types of systems, especially the more distensible thermoplastics. *Improvements in physical properties of filled versus unfilled systems generally reflect interaction or reinforcing between the polymer and filler having surface treatments to provide a high degree of interaction through electrostatic or chemical bonding.*

\*        \*        \*        \*        \*        \*        \*

(pp. 215–16)

FILLERS AND REINFORCEMENTS

Plastics, like many other engineering materials, have limitations, some of which may be overcome by proper design. However, a large number of properties may be enhanced by the addition of properly selected fillers to the resin system. The properties of the filled composite differ from those of the resin since the filler rather than the resin becomes the load bearing member and the resin functions primarily as a binder. Thus, the properties of a filled resin are essentially related to the adhesion between the filler and the resin.

In many instances, fillers such as calcium carbonate, calcium sulfate, talc and silica cost less than the resin, and are called extenders. In contrast, some of the more sophisticated fillers cost many times that of the resin. Fillers contribute to the temperature resistance, moisture resistance, fire retardancy, electrical resistance, specific gravity, shrinkage, and coefficient of expansion of plastics. Actually the use of appropriate fillers permits the design of plastics to meet a wide variety of physical requirements.

\*        \*        \*        \*        \*        \*        \*

(p. 216)

*The amount of filler may vary from a few per cent*, when its function is the improvement of surface properties, *to over 90%* in resin-sand mixtures for shell molding composites. Since most properties of the composite are a function of the filler, the op-

timum resin content is that required to coat the surface of the filler and bond it firmly together.

\* \* \* \* \* \* \*

**Calcium Carbonate.** This is available as natural ground limestone and as precipitated calcium carbonate in a wide range of particle sizes. *The small-sized product imparts opacity, whiteness and excellent surface characteristics to the finished composite.* [Emphasis added.]

The *Modern Plastics Encyclopedia*, Vol. 39: No. 1A (1961), states the following at p. 556:

Fillers vary widely in availability, cost, composition, physical, electrical, and chemical properties. The choice of fillers in the formulation of molding compounds is usually governed by the end-use application. \* \* \*

Because some fillers cost less than the resinous portion of the molding compounds, they are sometimes considered solely as extenders. This is contrary to Dr. Baekeland's original conclusions relative to the importance of fillers (wood flour) in overcoming brittleness. Also, those who have paid $10/lb. for a mixture of phenolic resin and quartz filler recognize that *fillers are functional materials whose specific contributions to the qualities of molding powders are not necessarily based on economics.*

Fillers are essential for the production of strong moldings of compositions based on allylic, epoxy, melamine, phenolic, or urea resins. They reduce crazing, shrinkage, coefficient of expansion, and porosity. The surface appearance, strength, resistance to environment, and moldability can be improved by the proper selection and use of fillers.

*Fillers may constitute over 90% of the mixture,* as in the case of shell and wood waste moldings. *As little as 2.5%* phenolic resin *can be used* to bind the sand particles in the shell molding process. \* \* \*

\* \* \* \* \* \* \*

The connotation that fillers are cheap extenders has handicapped their use and delayed important improvements of fillers and compositions containing them. A consideration of these compositions as aggregates and binders has provided a better understanding of the role of each component. [Emphasis added.]

On the basis of the foregoing authorities, we see no merit to plaintiffs' claim that when a substance performs a specific function in a compound, it may not be considered as filler for the purpose of being held together by a synthetic resin acting as the chief binding agent. Moreover, the record before us lacks any evidence to rebut the Customs Laboratory report or the testimony of the Customs Laboratory chemist that the calcium carbonate in the imported vinyl compound is acting as filler. Finally, plaintiffs' witness—Mr. Friedlander—did not testify—nor, for that matter, was he qualified to do so—that the synthetic resin was not acting as the chief binding agent in the imported merchandise. See *The Orient, Inc.* v. *United States*, 64 Cust.

Ct. 175, 181, C.D. 3978 (1970). See also *Sentora Hardware Distr.* v. *United States*, 59 Cust. Ct. 558, C.D. 3227 (1967); *Lee & Schiffer, Inc.* v. *United States*, 12 Cust. Ct. 183, C.D. 850 (1944).

In sum, protest 63/11309 is overruled. On the other hand, on the basis of the stipulation of the parties, protest 64/1001 is sustained. Judgment will be entered accordingly.